HAMILTON v. AMERICAN HULLED BEAN CO.

FRAUD — FALSE REPRESENTATIONS — SUBSCRIPTION TO CORPORATE STOCK—RESCISSION.

Complainants subscribed for $6,000 of preferred stock in defendant company upon the representation of defendant Fuller that $3,000,000 of the stock of the company had been issued as fully paid by the transfer of his United States and Canadian patents covering a certain process for hulling beans; and that $2,000,000 of stock remained in the treasury, of which $500,000 was preferred stock. Defendant Fuller in fact retained $11,500 of the preferred stock for his Canadian patents, in addition to the $3,000,000 of common stock which had been so issued. *Held,* that the representations were fraudulent and that the complainants were injured to the extent of the stock so retained, and entitled to rescind their subscriptions.[1]	GRANT and MOORE, JJ., dissenting.

Appeal from Barry; Davis, J., presiding. Submitted June 3, 1908. (Docket No. 1.) Reargued February 8, 1909. Decided May 26, 1909.

[1] As to rescission of stock subscription for fraud or misrepresentation, see note to *Fear* v. *Bartlett* (Md.), 33 L. R. A. 721.

Bill by James L. Hamilton and Henry T. Heald against the American Hulled Bean Company, Limited, and Charles D. Fuller to set aside the sale of corporate stock on the ground of fraud. From a decree dismissing the bill, complainants appeal. Reversed, and decree entered for complainants.

*Henry T. Heald* (*William P. Belden*, of counsel), for complainants.

*Harry C. Howard* (*Colgrove & Potter*, of counsel), for defendant Fuller.

BLAIR, C. J. This case was before the court on demurrer to the bill of complaint and the demurrer overruled at a previous term. *Hamilton* v. *Hulled Bean Co.*, 143 Mich. 277. The allegations of the bill of complaint and the nature of the case are sufficiently stated in the opinion filed therein. Both defendants have answered, proofs have been taken in open court, a decree entered . dismissing the bill of complaint without any indication of the grounds therefor, and complainants appeal to this court.

Defendant Fuller resides in Kalamazoo, and the American Hulled Bean Company, Limited, was located at Battle Creek. On March 12, 1901, two patents were issued by the United States to Fuller covering a process for hulling beans and preparing the products for food. He sold these patents to D. L. Merrill, Abram C. Wisner, Neal S. Phelps, and Martin V. Barker for $100,000 in cash and notes. Afterwards Fuller bought back a one-fifth interest in these patents for himself and brother for $20,000, and became associated with the others. On June 19, 1901, these parties organized a partnership association known as the American Hulled Bean Company, Limited. By the amended articles filed August 28, 1901, the capital stock of the company was fixed at $5,000,000, of which $3,000,000 was paid in by the incorporators by the assignment of

these patents. The remaining $2,000,000 of the stock was kept in the treasury, and it was agreed and provided that $500,000 of this treasury stock should be made preferred stock, and that the balance of $1,500,000, together with the $3,000,000 of stock issued for the patents, should all be deemed common stock. On the 28th day of August, 1901, the following agreement was executed by the parties:

"Agreement made this 28th day of August, 1901, by and between David L. Merrill, Neal S. Phelps, Abram C. Wisner, and Martin V. Barker, all of Battle Creek, Michigan, parties of the first part, and Charles D. Fuller and Frank D. Fuller, parties of the second part.

" For a good and valuable consideration to the parties of the first part in hand paid, the receipt whereof is hereby acknowledged and confessed, and the said first parties being each and every of them members of the board of managers of the American Hulled Bean Company, Limited, of Battle Creek, Michigan, they do hereby agree to and with the said second parties that they, as members of the board of managers of said American Hulled Bean Company, Limited, will vote as such managers that the said Charles D. Fuller shall have out of the treasury stock of said company the exclusive right to sell and dispose of one hundred and fifty thousand dollars, par value, of preferred stock, each share of preferred stock to be accompanied by one share of common stock, at not less than fifty cents for one dollar of preferred accompanied by one dollar of common stock; all over and above said sum shall belong to the said Fuller, and the balance shall be by him paid into the treasury of said company, but it is understood that he shall be under no obligation to sell said stock; the exclusive right is given to him to sell and dispose of such amount if he chooses to exercise it for five months from date only. Second party agrees to commence the sale of said stock within ten days, and devote all of his available time to the sale thereof.

" The said first parties do further agree that as such managers they will also vote that in consideration of the assistance that has been rendered by the said Charles D. Fuller, that the said Frank D. Fuller shall be employed the first year as the manager of said company, and that his salary shall be five thousand dollars.

" In witness whereof the parties hereto have hereunto

set their hands and seals the day and year first above written.

[Signed]      "DAVID L. MERRILL.    [Seal.]
                 "ABRAM C. WISNER.    [Seal.]
                 "NEAL S. PHELPS.    [Seal.]
                 "MARTIN V. BARKER.    [Seal.]
                 "CHARLES D. FULLER.    [Seal.]
                 "FRANK D. FULLER."    [Seal.]

On October 22, 1901, but under date of September 4th, the following action was taken and entered in the record as part of the record of a meeting of the board of managers:

"It was moved and seconded that one hundred and fifty thousand dollars ($150,000) of the preferred stock and one hundred and fifty thousand dollars ($150,000) of the common stock of this company be sold to Charles D. Fuller, and issued to him or such persons as he may direct for the sum of seventy-five thousand dollars ($75,000) in cash and the assignment by said Charles D. Fuller to this company of all rights in the Canadian patents now pending, or which may be applied for hereafter on bean-hulling machinery, the process of hulling beans and everything else pertaining thereto, which he may invent or which may be secured by said Charles D. Fuller. Carried unanimously."

The record of the company of October 30, 1901, is, in part, as follows:

"Present, the full board. The following letter from Charles D. Fuller was read:

"'To the AMERICAN HULLED BEAN Co., Limited.

"'*Gentlemen:* I have sold eight hundred and fifty (850) shares of preferred stock of your company, amounting to eighty-five thousand dollars ($85,000), being part of the preferred stock of one hundred and fifty thousand dollars ($150,000) that was voted to me by resolution of your board of managers September 4th, 1901. The sale of this stock has been made at par to the following persons, each of whom has purchased the number of shares of preferred stock set opposite his name. * * * You will apply seventy-five thousand dollars ($75,000) of the proceeds of this sale on the cash payment which I was required to make by the terms of said resolution, and the balance you will return to me.

"'Yours truly,

"'CHARLES D. FULLER.'

"On motion of Mr. Phelps, supported by Mr. Barker, it was unanimously resolved that the foregoing proposition be accepted and that the chairman and secretary be directed to execute a written acceptance thereof, which was accordingly done, and the following is a copy thereof:

"'The American Hulled Bean Company, Limited, hereby accepts the foregoing proposition, and agrees with said Charles D. Fuller and the above-named subscribers to said stock severally that it will upon the full payment of the par value of the said stock at the time and manner stated in the foregoing communication, issue, and deliver to said several purchasers, his representatives or assigns, the number of shares of preferred stock subscribed and paid for by him at par.

"'We further agree to credit the moneys paid for said stock up to the amount of the seventy-five thousand dollars ($75,000) on the amount which the said Charles D. Fuller is to pay us in pursuance of the resolution aforesaid, and to pay to him all moneys paid to us on account of this transaction in excess of that sum.

"'By order of the board of managers.

"'AMERICAN HULLED BEAN COMPANY, Limited,

"'By DAVID L. MERRILL, Chairman.

"'F. D. FULLER, Secretary.'"

The defendant the American Hulled Bean Company admitted in its answer the allegation of the second paragraph of complainant's bill of complaint "substantially as therein set forth." The second paragraph of the bill contained, among others, the following allegations:

"And, as a further inducement to him for the purchase thereof, agreed to aid him in disposing of said stock at a profit to himself, and, in furtherance of said agreement, it was then and there agreed and understood by and between said defendants that said Fuller would forthwith undertake the work of interesting the general public in the sale of said stock, and that he might solicit subscriptions for preferred stock in said company, offering two shares of common stock as a bonus with each share of preferred stock in said company in the name of said company, and for and in its behalf, and that he might further represent that the preferred stock was being sold only for cash and at one hundred cents on the dollar, and that said company had authorized one hundred thousand dollars ($100,000) of said preferred stock to be placed on the market, and it was further agreed between said defendants

that the subscription lists used in obtaining said subscriptions might state and set forth that the stock to be issued to and received by the subscribers thereto, should be treasury stock, and that there was in the treasury of said company five hundred thousand dollars ($500,000) of the preferred stock and one million five hundred thousand dollars ($1,500,000) of the common stock of said company, but that, when subscriptions were obtained by said Fuller, they should, in fact, be filled by the said company by issuing to said subscribers stock from the block sold to said Fuller as aforesaid without notifying or informing such subscribers of the substitution; and, in furtherance of said fraudulent scheme, it was further agreed by the said defendants that the said Hulled Bean Company should collect and receive from subscribers to its capital stock so obtained by said Fuller the full amount of their stock subscriptions at par, and then, without informing said subscribers of the disposition made of their money, should apply all amounts so received, first, in satisfying and canceling said purchase price of seventy-five thousand dollars ($75,000), to be paid by said Fuller to the defendant company, as hereinbefore set forth, and thereafter all amounts in excess of said sum, and the unsold portion, if any, of said block of stock, was to be turned over to said defendant Fuller in pursuance of the terms of the resolution hereinafter set forth. * * * No part of said stock was issued or transferred to defendant Fuller by said defendant, American Hulled Bean Company, Limited, at the time of the adoption of said resolution, nor did he pay any part of said purchase price, and your orators allege that said scheme to sell and dispose of the stock thus set apart for said Fuller under the pretense that the same was treasury stock was conceived and carried out by both of said defendants with the design and intent to cheat, deceive, and defraud all subscribers whom said Fuller might secure by means thereof."

The defendant Fuller in his answer denied the said second paragraph and all material allegations of fraud.

The company having notified defendant Fuller that it did not wish to receive over $75,000 of the subscriptions, he made such arrangements that only $77,000 was paid, of which $2,000 was paid to him by the company, as he alleges, for his services. Defendant Fuller testified, that, before calling upon complainants,—

" I first went and I consulted with a friend of mine up there, and he advised that I go and see the officers of the Michigan Trust Company, and, if possible, get them interested, and have them look into the proposition so as to be able to vouch for the facts that I was there to present."

Then he went to Mr. Withey and Mr. Hardy, the president and secretary of the Michigan Trust Company.

"I gave Mr. Hardy a bonus of common stock. I don't know that I could properly state the amount that was for Mr. Hardy alone. I think I can state how much common stock went to him and perhaps Mr. Withey, and I don't know who else. I think $35,000 of the common stock went to them. * * * I think that the matter of the commission was discussed with them in view of the fact that they had to do a good deal of investigating and so on, and Mr. Hardy, as I remember it, took the position that he did not want any cash out of the matter, but that he thought with the amount of stock that was outstanding that he was entitled to something in the way of a stock commission, and, in pursuance of that request, I agreed to give the $35,000 of common stock. If I remember right, Mr. Hardy took about two weeks to make these different trips, and investigate and look up the patents, and so on and so forth. My impression is that they spoke of the matter of a commission at first, before he made the trips, and I think that I said that I would give them $15,000, and I think that the matter was left open then until after these investigations went on, and they consumed considerable more time than I guess Mr. Hardy figured on, and at this time he drew the subscription list on September 23d, he raised the point that that was not sufficient, and so it was arranged that I was to give him this amount that I did, which I remember to be $35,000 of the stock. My memory is that that final agreement was reached just as we were drawing the subscription list to take around to the Grand Rapids people. * * * I don't remember positively, but I think I gave Claude Hamilton a small bonus. He was assistant secretary, or some similar capacity, of the Michigan Trust Company at that time. I think there was a further arrangement with Claude Hamilton by which I agreed to buy his stock back at 50 cents on the dollar for the preferred stock at any time in case he should want to sell it. Afterwards his stock was taken back. I made an arrangement as I remember it with two

gentlemen in Battle Creek, and that contract with Claude Hamilton was carried out."

Fuller also arranged with Hyde and Thornton, attorneys at Grand Rapids, to assist in placing the stock.

"The commission I paid Hyde and Thornton was $1,500 and some common stock. I think it was $6,500 of common stock. The subscription was filled out of the stock that I supposed I had coming to me from these Canadian patents, and the common stock was from my own personal stock because the other common stock was all used up. * * * The only subscription of the Grand Rapids subscribers that was paid to me direct was from Hyde and Thornton, and they knew they were getting my personal stock because I told them distinctly, and they had these bonuses or commissions coming to them, so that they were very glad to accept of the arrangement. They paid $3,500 for $5,000 of stock.

"Q. How much in money did you have after paying the expenses of the sale out of this $3,500?

"A. I estimated that barely $2,000."

Defendant Fuller instructed Hyde and Thornton as follows:

"As your subscriptions are going to be paid into the Michigan Trust Company, you had better send your amount directly to me, as, of course, it will not do to let them find out anything as they would have to if they received the subscriptions."

Having made these arrangements for satisfactory investigations and introductions, defendant Fuller called upon complainants, and, according to their testimony, which we accept as substantially correct, represented to them, in substance, that he and his associates had organized the defendant bean company, and had conveyed to it their entire invention, including the patents for the United States and Canada, so that they were in a position to take out patents wherever it was deemed advisable to do so; that the company had been organized with a capital stock of $5,000,000, of which $3,000,000 had been given for the invention and patents, and that the remaining

$2,000,000 was in the treasury and had been divided into $500,000 of preferred stock and $1,500,000 of common stock; that the stock he was selling was treasury stock, and that all the proceeds of their subscriptions would go into the treasury and build up the company's business; that he had no personal interest in selling the stock, but was in Grand Rapids merely at the request of the hulled bean company; that he was not offering the stock generally, but placing it with his business friends and acquaintances; that he did not know that he should even get his expenses paid in connection with it; that he did not tell either of the complainants about his arrangement with the hulled bean company under the option of August 28th, nor did he tell them about the resolution of September 4th under which $75,000 of the preferred stock which was supposed to be in the treasury was to be turned over to him for the Canadian patents. On the contrary, he said the company owned the invention as well as the patents, and that all of the preferred stock was treasury stock. The subscription agreement signed by complainants contained the following:

"The American Hulled Bean Company, Limited, of Battle Creek, Michigan, has been organized with a capital stock of $5,000,000 (50,000 shares at $100 each), $4,500,-000 of which is common stock and $500,000 of which is seven per cent. preferred stock; $500,000 preferred stock and $1,500,000 of the common stock is treasury stock."

We are of the opinion that the allegations of the bill were sustained by the proofs, and that complainants were entitled to a decree, unless, as contended by counsel for defendant Fuller, the proofs demonstrate that complainants were not injured by the misrepresentations. This contention rests upon the undisputed fact that the $75,000 in cash to be paid by Fuller to the company was actually paid to it out of the subscriptions and upon the further alleged fact that on and shortly prior to June 12, 1902, and long prior to this suit, he had assigned to the company

all of his then holdings of stock. On the date last mentioned the following receipt was given:

"Received of Charles D. Fuller an order for all of his holdings in the capital stock of the American Hulled Bean Company, Limited, which is hereby declared to be a full settlement of all our demands against him of every name, nature and description.

[Signed] "Martin V. Barker.
"D. L. Merrill.
"A. C. Wisner.
"Neal S. Phelps."

Defendant Fuller testified:

"Q. Referring now to this block of preferred stock that was set aside to you in this resolution, and that you have spoken of as being surrendered prior to the receipt in June, was any of it ever issued to you?

"A. Of the $75,000? Yes, sir; there was. I drew $11,500 par value of it.

"Witness (continuing): That is all I ever drew. The rest was unissued. Part of that $11,500 I used to pay commissions and bonuses with in order to get the option financed up there in addition to the $53,000 of my own common stock, aside from my own common stock that I surrendered as mentioned in the trustee agreement. * * * I had given up over $53,000 of that that I had paid cash or its equivalent for. What I had left, both preferred and common, I considered just as much my property as anything I owned in the world, and I considered that the Canadian patents were the property of the company, and that I had given them an equivalent.

"Q. Now, after the company became insolvent, you say you transferred all of your holdings in it back to them, did you not?

"A. Well, as a matter of fact, I never had any of that $75,000 of preferred stock.

"Witness (continuing): That is, it had not been issued to me, except I was forced to draw some of it to pay commissions and bonuses. Five thousand dollars more of it I frittered away for the first premium on a life insurance policy. I don't remember who I did pay that to, but it was in the New York Mutual Life, as I remember it, at Grand Rapids, and Mr. Branch bought the stock later of an agent, according to my best knowledge, which I believe

is correct.   At a subsequent date, when the company was hard up, I transferred back to it $63,500.   That stock stood to my credit, and I either transferred it back or to a trustee.   I think it may be that instead of transferring it directly to the company that I transferred it to a trustee for the company, so that it was put where they could have the benefit of it when they wanted it.   I have never drawn it or tried to sell it; simply let it lie there in the treasury.   I did not take this Exhibit I, which is a release from the managers, at that time.   As I remember it, that was for the common stock.   I don't remember that I took any receipts for the preferred stock.   I don't remember that the American Hulled Bean Company had any demands against me at the time that receipt, Exhibit I, was signed.   I just took the release as I remember it as a matter of precaution in case anything should ever arise."

It is apparent from his own testimony that defendant Fuller did not restore to the company all of the preferred stock allotted to him for his Canadian patents, but used $11,500 thereof for his own purposes, and derived a direct personal benefit therefrom, and to that extent injured the complainants, to whom he had represented that the Canadian patents, along with the United States patents, had been paid for by the transfer of the $3,000,000 of common stock.

The decree is reversed, and a decree may be entered for complainants, as prayed for, with costs of both courts.

OSTRANDER, HOOKER, MCALVAY, and BROOKE, JJ., concurred with BLAIR, C. J.

GRANT, J. (*dissenting*).   A sufficient statement of the issues in this case is found in 143 Mich. 277.   The case was then before us on a demurrer, and we held that the complainants had stated a case in their bill of complaint which entitled them to an answer and proofs.   Our decision was based upon purely legal questions, and there is nothing in it to indicate our views upon the merits.   The case has been heard upon pleadings and proofs taken in open court, and the bill dismissed, and it is now before us on the merits. In paragraph 2 of the complainants' bill they set forth

particularly the transactions relied upon as fraudulent, and close the paragraph by alleging that—

"Said scheme to sell and dispose of the stock thus set apart for said Fuller under the pretense that the same was treasury stock was conceived and carried out by both of said defendants with the design and intent to cheat, deceive, and defraud all subscribers whom said Fuller might secure by means thereof."

The answer, which is signed "American Hulled Bean Company, Limited, by Joseph W. Bryce," admits the allegation therein contained (paragraph 2 of the bill) substantially as therein set forth. The answer is not sworn to. The record fails to show who Mr. Bryce is. He was not a member of the association during its life. His name does not appear in any of its records or as a stockholder. It is not shown that he had any knowledge of the transactions set forth in the bill. Evidently he did not have other than by hearsay. Mr. Bryce cannot thus brand Mr. Fuller or his associates with the conspiracy to commit fraud. The answer is worthless, and cannot be considered for any purpose involved in this suit.

The sole basis of the complainants' claim is that the defendant Fuller falsely represented to them that the stock for which he asked them to subscribe was treasury stock, and that he fraudulently, with the connivance of the corporation, substituted his own individual stock in place of treasury stock, and that he falsely represented that the company had acquired the Canadian patents. They assert that as a result of this fraud they were induced to part with $6,000 which has been a total loss to them. Defendant Fuller had invented machinery for hulling beans, designed to remove from the beans the indigestible covering or hulls. He obtained patents therefor both in the United States and Canada. He sold several gentlemen in Battle Creek his United States patents for the sum of $100,000 in cash. Defendant Fuller shortly thereafter purchased a one-fifth interest in the patents for the sum of $20,000, which he paid. The purchasers of the patent were busi-

ness men of good reputation. They purchased after a careful investigation into the patent and the probable value of the product. They purchased with a view to organizing a partnership association, limited, for the purpose of erecting machinery and making the product. They organized with a capital of $5,000,000—$4,500,000 of common and $500,000 of preferred stock. Defendant Fuller was a man of good reputation financially and in a business way. He was not an officer of the company. Mr. Hardy, the secretary of the Michigan Trust Company, hereinafter referred to, made several trips to Battle Creek to investigate into the patents and process, and Mr. Fuller's standing. After satisfying himself upon these points, he subscribed for some of the stock, and acted for the other Grand Rapids subscribers as hereinafter stated. The purchasers of the patent who were members of the defendant company on August 28, 1901, gave the defendant Fuller and his brother an option agreement reading as follows:

" For a good and valuable consideration to the parties of the first part in hand paid, the receipt whereof is hereby acknowledged and confessed, and the said first parties being each and every of them members of the board of managers of the American Hulled Bean Company, Limited, of Battle Creek, Michigan, they do hereby agree to and with the said second parties that they, as members of the board of managers of said American Hulled Bean Company, Limited, will vote as such managers that the said Charles D. Fuller shall have out of the treasury stock of said company the exclusive right to sell and dispose of one hundred and fifty thousand dollars par value of preferred stock, each share of preferred stock to be accompanied by one share of common stock, at not less than fifty cents for one dollar of preferred accompanied by one dollar of common stock, all over and above said sum shall belong to the said Fuller, and the balance shall be by him paid into the treasury of said company, but it is understood that he shall be under no obligation to sell said stock; the exclusive right is given to him to sell and dispose of such amount if he chooses to exercise it for five months from date only. Second party agrees to com-

mence the sale of said stock within ten days and devote all of his available time to the sale thereof. The said first parties do further agree that as such managers they will also vote that in consideration of the assistance that has been rendered by the said Charles D. Fuller, that the said Frank D. Fuller shall be employed the first year as the manager of said company, and that his salary shall be five thousand dollars."

Evidently, as hereinafter appears, $75,000 was all the money the board of managers deemed necessary to raise to equip the plant. Fuller was to have as compensation all he obtained over the 50 cents per share. This agreement was modified before any subscriptions were solicited or made.

About this time the members of the defendant company became solicitous about Mr. Fuller's Canadian patents, and, fearing that they might largely interfere with the sale of the proposed product to the people, armies, and navies of other countries, made an arrangement for the purchase of the Canadian patents. This arrangement rested in parol until October 22, 1901, when it was put in form by a resolution of the board of managers, dated by their direction September 4, 1901, and providing that "$150,000 of the preferred stock and $150,000 of the common stock be sold to Charles D. Fuller and issued to him, or such persons as he may direct, for the sum of $75,000 in cash, and the assignment by said Charles D. Fuller to this company of all rights in the Canadian patents now pending or which may be applied for hereafter on bean-hulling machinery," etc. Defendant Fuller proceeded under this arrangement to solicit subscriptions in Grand Rapids during the months of September and October. He placed his proposition before Mr. Withey, president, and Mr. Hardy, secretary, of the Michigan Trust Company of Grand Rapids. He explained to them his invention and plan of procedure. Subscriptions were taken by 19 business men and firms, all of Grand Rapids, except one. They subscribed for and agreed to take from 10 to 50 shares each, the par

value of a share being $100.  The original option agreement was also modified so that Mr. Fuller could sell the preferred stock only at its par value, and should give to each subscriber to the preferred stock "two shares of the treasury common stock of the company gratis."  This provision was incorporated in the subscription agreement signed by the complainants and the others.  It will be readily seen that the agreement of August 28, 1901, was not, in fact, the agreement under which the subscriptions, including the complainants', were solicited and obtained at Grand Rapids.  It has been so modified as to almost lose its identity.  Instead of being authorized to sell at 50 cents on the dollar, he could sell only at par ($100) per share. He was to give two shares of the common stock instead of one for each share of preferred stock subscribed.  No provision was made for compensation to him for his services in effecting the sales.  The subscription agreement also contained the following important provision:

"It is further understood that the following subscriptions are made pending the passage of satisfactory resolutions by the board of managers, establishing the character of the preferred stock."

When Mr. Fuller reported to the company that he had sold $85,000 of the preferred stock; its board of managers October 22, 1901, informed him that they desired only $75,000, and that he must fill all above that from his own personal stock.  He thereupon induced one subscriber for $10,000 to surrender $5,000, and he paid Hyde & Thornton $5,000 out of his own.  On the 30th day of October, 1901, Mr. Hardy, secretary of the Michigan Trust Company, with an attorney, Mr. Kleinhans of Grand Rapids, went to Battle Creek and had an interview with the managers of the defendant company and Mr. Fuller. The defendant Fuller and the managers of the defendant company understood from the statements made by Mr. Hardy that he was there representing all the Grand Rapids subscribers, and had brought Mr. Kleinhans to exam-

ine the papers and records, and to see that the rights of the Grand Rapids stockholders were duly protected. Mr. Kleinhans was a lawyer of ability, experience, and good character. The defendant corporation had its attorney at Battle Creek. Defendant Fuller had no attorney. All the records and documents relating to the transactions were submitted to Mr. Kleinhans and Mr. Hardy, and were examined by them.

Mr. Kleinhans advised the parties interested that the company could not give away its stock as a bonus; that, if the subscribers took the stock under this subscription agreement, they would be liable to assessments; and that the only legal way to avoid this liability was to use Mr. Fuller's stock which had been fully paid by the transfer of the Canadian patents in carrying out the agreement with the Grand Rapids stockholders. Mr. Fuller at first objected, but, upon being advised that he would incur no liability by the arrangement, and evidently seeing that the subscribers would not take the stock on any other basis, the plan was agreed to, and the following agreement drawn up by Mr. Kleinhans and executed:

"This agreement, made this thirtieth day of October, A. D. 1901, by and between Charles D. Fuller, of Kalamazoo, Michigan, party of the first part, and the Michigan Trust Company, of Grand Rapids, Michigan, as trustee, party of the second part, witnesseth: Whereas, said party of the first part is largely interested in the American Hulled Bean Company, Limited, of Battle Creek, Michigan, and whereas, said company needs cash capital in its business and the procurement of the same will be of great benefit to said party of the first part; and whereas, at the request of the party of the first part the following named persons have subscribed for the preferred stock of said company for the number of shares set opposite their respective names, viz., Lewis H. Withey, Grand Rapids, Michigan, fifty shares; George E. Hardy, Grand Rapids, Michigan, fifty shares; William Judson, Grand Rapids, Michigan, fifty shares; J. M. Barnett, Grand Rapids, Michigan, fifty shares; T. Stewart White, Grand Rapids, Michigan, fifty shares; Moseley Brothers,

Grand Rapids, fifty shares; C. H. Berkey, Grand Rapids, Michigan, fifty shares; John T. Byrne, Grand Rapids, Michigan, fifty shares; Hyde & Thornton, Grand Rapids, Michigan, fifty shares; J. C. Holt, Grand Rapids, Michigan, fifty shares; J. L. Hamilton, Grand Rapids, Michigan, fifty shares; Charles J. Canfield, Manistee, Michigan, fifty shares; Filer & Son, Filer City, Michigan, fifty shares; Henry T. Heald, Grand Rapids, Michigan, ten shares; F. C. Miller, Grand Rapids, Michigan, twenty-five shares; Darwin D. Cody, Grand Rapids, Michigan, thirty shares; Claude Hamilton, Grand Rapids, Michigan, twenty-five shares; George E. Luther, Grand Rapids, Michigan, ten shares; and whereas, the understanding and agreement between said party of the first part and said several subscribers was, at the time said subscriptions were made, that the said party of the first part should transfer to said several subscribers two shares of common stock of said company, for each share of preferred stock which would be subscribed and paid for, said common stock being the individual property of the party of the first part which has been fully paid for by him and is non-assessable; and whereas, said party of the first part has this day delivered to the said party of the second part certificates for the common stock of said company as follows: Certificates numbers one to thirteen, both inclusive, each for one hundred shares; certificate numbered fourteen for two hundred shares; certificates numbered fifteen and sixteen each for fifty shares; certificates numbered seventeen and eighteen each for twenty shares and certificate numbered nineteen for sixty shares; amounting in all to seventeen hundred shares, which certificates have been duly assigned in blank by the party of the first part and delivered to the party of the second part for the purposes of this agreement.

"Now, therefore, this agreement witnesseth, that the parties hereunto have agreed together as follows: Said Michigan Trust Company, as trustee, is hereby authorized and directed to transfer and deliver to each of said subscribers for preferred stock as aforesaid two shares of said common stock for each share of preferred stock, which said subscribers shall pay to the treasurer of said company the par value thereof; such payments to be made in the time and manner this day agreed upon between the said company and the party of the first part.

"2. The Michigan Trust Company agrees to hold said certificates for common stock and transfer and deliver them to the purchasers of said preferred stock in accordance with the terms of this agreement above stated, and, if any subscribers for said preferred stock shall not pay their subscriptions and shall not become entitled to said common stock, then to return such unearned common stock to the party of the first part.

"3. Should any of said subscribers make default in the payment of the whole or any part of their several subscriptions, such default shall not affect or impair the rights of the other subscribers who do not make default to their shares of the common stock.

"4. The original subscription list for said preferred stock, now in the possession of the party of the first part, shall be delivered upon the execution of this agreement to said Michigan Trust Company, which shall hold the same until the time when the final payment on said subscription will become due, and, if all of said stock shall then have been paid for in full, it shall return said subscription list to the subscribers; otherwise to the party of the first part on demand. Nothing herein contained is intended to nullify said subscriptions until the same shall have been paid in full. This agreement shall inure to the benefit of the representatives and assigns of the subscribers of said preferred stock. It is understood and agreed that the payment by the purchasers of said preferred stock, their heirs or assigns, severally, shall entitle them respectively to the said common stock without the payment of any further or additional price for said common stock."

Mr. Kleinhans testified that he had these subscriptions filled from Mr. Fuller's stock "to protect the purchasers so that there would be no liability in their stock subscriptions in case the company became insolvent."

At the meeting it was suggested by Mr. Hardy that there should be a representative of the Grand Rapids stockholders on the board. In order to accomplish this, a certificate for one share was issued to Mr. Hardy, who was then only a subscriber, and not a stockholder. Frank D. Fuller resigned as director, and Mr. Hardy was elected director in his place. All the subscribers, including the complainants, paid their subscriptions to the defendant

company through the Michigan Trust Company after the above agreement. The money went into the treasury and was used in erecting its plant. Not a penny was received by or paid to Mr. Fuller. Like many another glittering proposition, this proved a failure. The reason perhaps is immaterial. It is due to Mr. Fuller to say that no one holds him at all responsible for the failure. One stockholder, the chairman of the company, who had invested $100,000 in the enterprise, testified:

"I had faith in the concern up to that amount. There were various opinions on why the concern did not succeed; but my own is that the women beat us. They would not follow the directions on the cans in cooking the product."

I think the record shows that Mr. Fuller acted in good faith. None of the $75,000 went into his own pocket. He did not profit by it. When the company began to be in financial distress, he turned into the treasury all his stock in the hope to thus assist the company. None of the stock represented by the $75,000 was issued directly to him, but went directly to the stockholders. No preferred stock was ever issued to him except that of $11,500, the most of which was stock which the company in good faith compelled him to take in reduction of the $85,000 subscribed. The testimony is that, if the stock had proved good, this would not have been more than a reasonable compensation for his services. Mr. Fuller testified that he explained to the complainants fully about the Canadian patents and his connection with the company. He denies the representations which the complainants assert he made. It is stated by counsel for complainants that Mr. Fuller has not explicitly denied the testimony of the complainants. I do not so read the record. He testified:

"I stated to Mr. Hamilton that I had sold my United States patents to the Battle Creek parties for $100,000, and then had sufficient faith in the deal so that I had gone and bought back a one-fifth interest for $20,000; that I had arrangements whereby I was to receive $75,000 of

the preferred stock of the company for my Canadian patents; that the Michigan Trust Company, through Mr. Hardy and Mr. Withey, had investigated this proposition, had drawn up the subscription list itself, and it was to them that the clause in the subscription list to define the rights of the preferred stock were to be satisfactory; that they had each subscribed as I showed them.  *  *  *

"*Q*. Did you tell him anything in any of those interviews that was not true?

"*A*. I certainly did not.  *  *  *  I never told Mr. Hamilton or Mr. Heald that the Canadian patents were included in the patents that had been paid for by the $3,000,000 of stock. I told them that I was to receive $75,000 of the preferred stock for the Canadian patents in addition to my sale of the United States patents."

On his attention being called to the allegations and charges in the bill, and being asked whether he in any way had any secret or other understanding with the company that he did not freely tell to the complainants, as well as to others, in Grand Rapids, he replied:

"I want to state that every one of those charges is without the slightest foundation in fact."

This and other similar language is, in my judgment, a sufficient denial of the conversations related by the complainants.

While the circuit judge filed no opinion, we assume that he found the facts against the complainants. One was a business man and the other an attorney. There was no haste in their action. They took time to investigate. I cannot resist the conclusion that they knew before they paid their subscriptions that the Michigan Trust Company was acting for all the subscribers. Their subscription papers informed them that the character of the preferred stock was to be established by satisfactory resolutions of the board of managers. They must have been informed of these resolutions, or trusted the Michigan Trust Company to see to a determination of the character of the stock which they were to receive. They are the only stockholders complaining, and are the only

witnesses in their behalf. It is not necessary to find that any one is guilty of wilful misstatements. The bill was not filed until two years and four months after the conversations occurred. The case was not heard until nearly six years thereafter. Human recollection is faulty, and is liable to be warped by self-interest. To remember the exact words so long after is next to impossible. As in all such cases, so here, some one is mistaken as to the language used. The circuit judge saw the witnesses. There were other considerations to guide him to his conclusion. The members of the defendant company do not testify to a single dishonest word or act on the part of Mr. Fuller. As above stated, he stood high as a man of honor in the estimation of his fellows. He did not try to sell any of his own stock. When financial trouble came to the company, he did all that an honorable man could do. The circuit judge saw this man's conduct from the beginning to the end of this transaction. Very likely he reached the conclusion that it was improbable that a man of hitherto unblemished character, who was not a promoter —this being his first venture—would make false and fraudulent statements, and especially to those who had it in their power to determine their truth or falsity within a few hours by letter or a few minutes by telephone. Perhaps the circuit judge was also influenced by the fact that Mr. Fuller did not treat the stock he was selling as his own stock, but as treasury stock, and that the subscribers were to, and did, pay all their money into the treasury of the company, and that he only expected to make a profit by the success of the business and thus make his own stock valuable. If these were some of the reasons which induced his conclusion, they meet my approval.

The record in my judgment shows no occasion for any false representations on the part of Mr. Fuller. By the final arrangement made complainants obtained common stock free from liability to assessment. They were certainly benefited by this transaction. Had the product

to be manufactured proved the success that all anticipated, the stock would have been valuable and large profits realized by the stockholders. Complainants and the other stockholders entered upon a commercial venture, the success of which was uncertain. It is unjust now to put the consequences of the disastrous failure upon Mr. Fuller, who acted in good faith throughout, and by the advice of the attorney for the trust company, which company in the end, if not in the beginning, acted for the complainants as well as the other stockholders.

I think the decree should be affirmed, with costs.

MOORE, J., concurred with GRANT, J.