LILLIE MAE MUMME ET AL. V. S. M. N. MARRS ET AL.

Application No. 17401.   Decided May 16, 1931.

(40 S. W., 2d Series, 31.)

384

[redacted]

*King & York,* for appellants.

Legislative classification must not be arbitrarily artificial or evasive and must be based upon real or substantial distinction which makes one class so different from others as to suggest the necessity for different legislation with respect thereto.

Section 2 provides that the allotment of all state aid shall be subject to the following conditions:

"Each school receiving aid shall be provided with a suitable school house, erected in accordance with the Texas school house building law,

or meeting substantially the requirements thereof, which shall be well located on a plot of ground not less than one acres in extent, properly drained."

· The school house at Peach Tree School in common school district No. 23, Medina county, which your minor plaintiff attends, is not built in accordance with article 2920 of the Revised Civil Statutes which comprises the building specifications of public school buildings in Texas, because said building was built long prior to the enactment of said law, and the cost of construction was less than $400 and such school building in common school districts costing less than $400 are exempt by article 2921 of the Revised Civil Statutes from said building specification. Plaintiff alleges that such restrictions and discrimination as to the school house which your minor plaintiff attends, is an unwarranted, unreasonable classification and not based on any substantial distinction and is special legislation for the use and benefit of those schools who are so constructed as to conform to the building specification of the state of Texas, and to the children who attend the same, to the detriment and injury of plaintiff who is compelled to attend school wherein the school house does not conform to the building specification, as aforesaid, and that same is an arbitrary division of the schools and school children of Texas, and gives one division an advantage of state aid to the school attended by them, to the detriment of the other class, though both divisions are of the same class and are similarly situated as to the needs of an education, and that there is no real difference or distinction that differentiates in important particulars the persons or classes of persons of those sought to be favored from the other class of schools, and school children sought to be discriminated against and that there is no natural and substantial reason for such attempted classification.

Sub-section 2 of section 2 of said act provides that before state aid shall be given, the following condition shall be met:

"Each school shall be provided with the necessary desks, seats and blackboards, with library, maps and charts, with such heating and ventilating equipments and such sanitary closets as are approved by the State Superintendent or his representatives."

The school which plaintiff attends is not provided with desks, seats, blackboards, library, maps and charts, with such heating and ventilating equipments and such sanitary closets as are approved by the state superintendent or his representatives; that same is an arbitrary division of the schools and school children of Texas, and gives one division an advantage of state aid to the school attended by them, to the detriment of the other class, though both divisions are the same class and are similarly situated to the needs of an education, and that there is no real difference of distinction that differentiates in important particulars the persons of those sought to be favored from the other class of schools, and school children sought

to be discriminated against, and that there is no natural and substantial reason for such attempted classification.

Sub-section 3 of Section 2 of said act is as follows:

"The teachers employed in State Aid schools shall furnish to the State Superintendent satisfactory evidence of professional training and teaching ability."

The teacher employed in the school which plaintiff attends, has never furnished to the state superintendent of education, satisfactory evidence of professional training and teaching ability. That the statute does not designate what would be, in law, "Satisfactory evidence of professional training and teaching ability", and said sub-section vests arbitrary discrimination in the state superintendent of education, as to what he considers satisfactory evidence of professional training and teaching ability, and does not prescribe a uniform rule of action with reference to what is satisfactory evidence under the law, and said state superintendent by said sub-section is not controlled or guided by any definite rule of specified conditions applicable to all similarly situated and is therefore unconstitutional and void; that same is an arbitrary division of the schools and school children of Texas, and gives one division an advantage of state aid to the school attended by them, to the detriment of the other class, though both divisions are the same class and are similarly situated as to the needs of an education, and that there is no real difference or distinction that differentiates in important particulars the persons or classes of persons of those sought to be favored from the other class of schools, and school children sought to be discriminated against, and that there is no natural and substantial reason of such attempted classification.

Sub-section 4 of Section 2 of said act reads as follows:

"No common or independent school district shall be eligible to receive aid unless it shall be providing for the annual support of its schools by voting and levying a local school tax of not less than 75 cents on the $100 property valuation; and provided further, that the property valuation shall not be less than said property is valued for State and County purposes; and provided further, that the above requirements of a maintenance tax levy shall not apply to districts maintaining a school for Indians."

Said sub-section is void and unconstitutional because it bars from participation in said fund appropriated and set apart by said act, every school in Texas which has not a tax of not less than 75c on a $100 property valuation; that your minor plaintiff and plaintiff's school is discriminated against, in that said school district only has a maintenance tax of 10c on the $100 property valuation, and all other schools and school children in Texas similarly situated are thus arbitrarily discriminated against; that there is a further arbitrary discrimination in said sub-section in that the requirements of the 75c maintenance tax levy shall not apply to districts maintaining a school for Indians; that the same is an arbitrary division

of the schools and school children of Texas and gives one division an advantage of state aid to the school attended by them, to the detriment of the other class, though both divisions are the same class and are similarly situated as to the needs of an education, and that there is no real difference of distinction that differentiates in important particulars the persons or classes of persons of those sought to be favored from the other class of schools, and school children sought to be discriminated against, and that there is no natural and substantial reasons of such attempted classification.

Section 4 violates section 1, article 2, of the Constitution of this state, in that it attempts to confer upon the state board of education powers not executive and powers which are legislative and judicial and therefore void and attempts to vest in the state board of education, legislative powers by allowing said board to fix the said schedule of salaries without giving said board any limitations, instructions or definite rule of specified conditions and without prescribing a uniform rule of action in the fixing of said schedule, but according to the designated officials arbitrary powers in the fixing of said schedule without being controlled or guided by any definite rule of specified conditions and said statute is void and unconstitutional; that same is an arbitrary division of the schools and school children of Texas, and gives one division an advantage of state aid to the school attended by them, to the detriment of the other class, though both divisions are the same class and are similarly situated as to the needs of an education, and that there is no real difference or dictinction that differentiates in important particulars the persons or classes of persons of those sought to be favored from the other class of schools, and school children sought to be discriminated against, and that there is no natural and substantial reason for such attempted classification.

Section 10 arbitrarily discriminates against any district that does not levy a local tax of not less than 50c for school purposes on the $100 valuation of property, is excluded from the benefits of said act; that same is an arbitrary division of the schools and school children of Texas, and gives one division an advantage of state aid to the school attended by them, to the detriment of the other class, though both divisions are the same class and are similarly situated as to the needs of an education, and that there is no real difference or distinction that differentiates in important particulars the persons or classes of persons of those sought to be favored from the other class of schools, and school children sought to be discriminated against, and that there is no natural and substantial reason for such attempted classification.

*Robt. Lee Bobbitt,* formerly Atty. Gen., and *Rice M. Tilley,* formerly Asst. Atty. Gen., for appellees.

Under the Constitution of Texas the Legislature is charged with the duty of establishing and making suitable provision for the support and maintenance of an *efficient* system of public free schools, and it has

long since been recognized that equal distribution of funds does not carry with it equal opportunities, and that in order to promote an efficient system of public schools it can not be done on a per capita distribution, and the Legislature was without constitutional inhibition and prohibition in enacting the rural aid law.

The purpose of said law being to promote the public school interest of rural schools and equalizing the educational opportunities afforded by the state to all children of scholastic age living in small and financially weak school districts. Said act is not unconstitutional in that it appropriates aid to those weak districts without appropriating aid to the financially strong districts, since the said classification applies equally to all within that class, although in appropriations such is not necessary.

The purpose of said law is to encourage consolidation and the better equipping of schools, and inviting the school districts to vote taxes for better schools, and thereby entitle themselves to state aid.

Said appropriation made by Senate Bill 3 was a disbursement of public funds for public purposes, and as such was not required to be appropriated equally and uniformly to every scholastic in Texas, and the apportionment was not arbitrary and discriminatory.

The rural aid bill defines specifically the class to be aided, providing the minimum number of pupils and the maximum and other things, prescribing a defined class. And the constitutional provisions mentioned in the petition under which the provisions of this act are alleged violative do not require that every person shall share equally with every disbursement of public funds. The classification is as clear as it can be made to be so as to help the small and financially weak school districts. The Legislature thereby attempting to respect the charge of the framers of the Constitution to bring about a "general diffusion of knowledge," it being impossible to bring about a general diffusion of knowledge if some school districts are not able to maintain schools for over three months and other school districts have money necessary to maintain terms of over nine months.

Like the highway laws in many states local districts are required to levy a certain tax before aid will be given them, because the state will not aid those who will not help themselves.

The maximum is fixed so as not to include those districts which are large enough to have good valuations, or which are so large as to be entitled to substantial amounts by reasons of scholastic population. Districts with large scholastic population will receive a substantial amount because of the per capita distribution of the available school fund, and the classification is, therefore, just and reasonable. The minimum is fixed at twenty so as to encourage consolidation, since it is a waste of money to try to maintain one teacher schools with twenty pupils, and the cost would be so great to the state that its policies could not be carried out. Section

6, article 8 of the Constitution of Texas; Drane v. Jackson, 256 U. S., 589; Miller v. Childers, 238 Pac., 204; State v. Gordon, 170 S. W., 894; Massachusetts v. Mellon, 262 U. S., 446; Cooley on Constitutional Limitation, vol. 3, page 817; Middleton v. T. P. & L. Co., 175 S. W., 557; Constitution of Texas, sec. 1, art. 7.

This court will not pass upon constitutional questions and decide this law to be invalid unless a decision on that very point becomes necessary to the determination of the cause. It is quite apparent and conceded that plaintiff in error lives in a district which has not voted the tax necessary and does not fall within any class to be aided under the act, and, therefore, this court will not pass upon the delegation of legislative authority or other matters, except those which go to the constitutionality of the act which she is entitled to raise because of her being adversely affected. It is both more proper and more respectful to co-ordinate departments to discuss constitutional questions only when that is the very lis mota, and this court will not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect, and who, therefore, has no lawful interest in defeating it. State v. Blake, 144 S. W., 1094; Newport v. Merkel Bros., 161 S. W., 549; Atkins v. State Highway Dept., 201 S. W., 230; Denison v. Municipal Gas Co., 257 S. W., 617.

The Constitution of Texas is one of grant and not of limitation, and the Legislature has every power which is not withheld from it expressly or by implication, and which is not denied it by the provisions of the Federal Constitution.

Said act does not constitute a denial of the equal protection of the law nor constitute the taking of property without due process of law, because the same is an appropriation of moneys for public purposes, each person within the district being entitled to the same rights and privileges, and the moneys being public funds belonging to the state.

This act does not constitute a denial of the equal protection of the laws. The act in question operates upon every person brought within the relation and circumstances provided for, and in every locality where the condition exists, and this being true, it is uniform in operation and applies equally to all persons within the class. See State v. Cincinnati, 102 N. E., 702; Sawyer v. Gilmore, supra.

The act does not constitute a taking of property without due process of law. The fact that this money is appropriated not for a local purpose but for a legitimate state purpose disposes of the plaintiff in error's contention that the law takes property without due process, and also disposes of her contention that because the tax is spent outside of her district she is denied the equal protection of the laws. She receives the equal protection of the laws when she is taxed for a legitimate state purpose by a tax which is levied equally upon every person in the state. See 12 C. J., page 1145; Miller v. Korns, supra.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

This case is pending before us on petition for writ of error. The action was originally brought in the district court by Lillie Mae Mumme, a minor within the scholastic age, pupil of a rural school in Medina county having less than twenty scholastics, and by Mrs. Louise Mumme, a taxpayer of that county. The cause was heard on an application for a temporary injunction, which was granted in favor of Mrs. Mumme but denied as to the minor plaintiff. On appeal to the Court of Civil Appeals the order granting the injunction was reversed and the application therefor denied. The sole question involved is the constitutionality of the rural aid appropriation act, effective for the biennium beginning September 1, 1929.

The law involved is chapter 14, General Laws of the Third Called Session of the 41st Legislature (1929). Section 1 thereof states its general object as follows:

"For the purpose of promoting the public school interest of rural schools and equalizing the educational opportunities afforded by the state to all children of scholastic age living in small and financially weak school districts."

The act is a complete law governing the distribution of the $5,000,000 dollars appropriated for the two-year period.

The constitutional provisions primarily invoked against the valadity of the act are those which in effect prohibit discriminatory and class legislation, and section 5 of article 7, which defines the "available school fund," and declares this fund "shall be distributed to the several counties according to their scholastic population." The insistence is strongly made that appropriations from the general fund of the state for common school purposes can only be made in accordance with this provision. We have concluded, however, that the limitation quoted has no application to the act before us, and that the objection urged against the validity of the act is without merit. Our reasons for this conclusion will now be stated.

The history of educational legislation in this state shows that the provisions of article 7, the educational article of the Constitution, have never been regarded as limitations by implication on the general power of the Legislature to pass laws upon the subject of education. This article discloses a well considered purpose on the part of those who framed it to bring about the establishment and maintenance of a comprehensive system of public education, consisting of a general public free school system and a system of higher education. Three institutions of higher learning were expressly provided for. Constitution, art. 7, secs 10 to 15. These express requirements of the Constitution have been met by the creation and maintenance of the University of Texas, the Agricultural and Mechanical College, and the Prairie View Normal. The Legislature, however, has gone far beyond the creation of the three institutions of

higher learning specifically required by the organic law, and has created ten additional institutions of similar character without direct constitutional grant, beginning with the Sam Houston Normal at Huntsville in 1879. —Marrs' Texas School Laws (Ed. 1929). In founding these ten institutions, beginning more than fifty years ago, the Legislature has necessarily held that the specific grants of power contained in the Constitution to erect and maintain the University of Texas, the A. & M. College, and Prairie View Normal were not limitations on its power to create other schools of similar purpose, and to maintain them by appropriations from the general revenue. This interpretation has never been questioned, and is consistent with authorities from other jurisdictions. 24 R. C. L., p. 561, sec. 3; Briggs v. Johnson County, 4 Fed. Cas., 120, No. 1872; Burr v. City of Carbondale, 76 Ill., 455; State Female Normal School v. Auditors, 79 Va., 233; Ransom v. Rutherford County, 123 Tenn., 1, 130 S. W., 1057, Ann. Cas., 1912B, p. 1356, and annotations. See also in re Kindergarten Schools, 18 Colo., 234, 32 Pac., 422, 19 L. R. A. 469.

The Legislature, in obedience to the constitutional mandate, has created a public school system, and the act here in controversy is a part of the legislative effort to make it an efficient one. This system now has five general sources of support expressly provided for in the Constitution: (1) The income from the permanent school fund; (2) one-fourth of the revenue from occupation taxes and poll taxes; (3) local school taxes by districts; (4) an ad valorem state school tax; and (5) appropriations by the Legislature from the general funds of the state.

The insistence is made that all appropriations from the general revenue must necessarily be made a part of the available school fund, and be apportioned to the counties in accordance with their scholastic population, as provided in article 7, section 5 of the Constitution. We cannot agree with this interpretation of the organic law. As just shown above, the Constitution has been liberally construed with reference to the creation of institutions of higher education, and the same liberal rules should apply in determining the power of the Legislature with reference to the public school system. We cannot readily suppose that those who framed the Constitution would have left the Legislature with plenary power to create and maintain a system of higher education, and at the same time have intentionally so drawn the instrument that the legislative hands would be tied when changed conditions rendered it desirable or necessary to give aid to the public school system in the manner outlined in the law before us.

That the enumeration in the Constitution of what the Legislature may or shall do in providing a system of education, is not to be regarded as a limitation on the general power of the Legislature to pass laws on the subject, is shown by the decision of the Court of Appeals in Ex parte Cooper, 3 Texas App., p. 489, 30 Am. Rep., 152, as well as by the history of legislation touching the subject of education. In the case

named the court had before it a legislative act which levied a privilege tax. There was urged against its validity the provision thereof which declared that this tax, when collected, should be "paid into the county treasury for the use and benefit of public free schools in the county." It was pointed out that section 3 of article 7 of the Constitution, as it then existed, declared that not more than "one-fourth of the general revenue of the State and a poll tax of one dollar on all male inhabitants", etc., could be set apart for the benefit of the public free schools. It was argued that this provision was a limitation on the power of the Legislature to set apart any tax other than one-fourth of the general revenue and the poll tax for school purposes. The court held that the insistence was erroneous, and that the tax and its assignment to free school purposes was valid, stating:

"We do not think the position well taken. The section mentioned, as we conceive, only intended to limit and restrict the Legislature in using and appropriating out of the general revenue for school purposes to the amount specified, *and not as a limit to their right to replenish or add to the school fund from other sources."* (Italics ours).

This case is clearly authority for the proposition that in ascertaining the power which the Legislature may constitutionally exercise with reference to the school system, we are not to limit or restrict that power, *including the power to assign revenue derived from sources other than those specifically named, to the school fund,* unless we find in the Constitution itself a specific limitation, or one which arises by necessary implication from the language used. This decision was made in 1878, only two years after the adoption of the Constitution. After this decision, in 1883, section 3 of article 7 of the Constitution was amended, and in that amendment, as in each subsequent amendment thereof, down to the present time, the limitation as to funds which could be appropriated from the general revenue was omitted, and there is now no express limitation in the section as to appropriations which may be made from the general revenue. Beginning in 1915, eight general laws making appropriations from the general revenue in aid of rural schools have been enacted. The acts of 1915 and 1917 were passed before the adoption of the amendment to section 3, article 7, which in express terms authorized the Legislature to make an appropriation out of the general revenue to supplement the avail-. able school fund otherwise provided for. General Laws, First called Session, 34th Leg. (1915), p. 22, chap. 10; General Laws, 35th Leg. (1917), p. 151, chap. 80; Harris' Anno. Const., p. 517. The act of 1915, in so far as we know, was unchallenged in the courts, and its essential elements have been embraced in each succeeding enactment, including the one now before the court for review. In 1917, however, the Legislature submitted, and in November, 1918, the people adopted, an amendment of section 3, article 7, which contained a special grant of power to the Legislature to make appropriations from the general revenue,

which, in so far as here involved, then read, and now reads, as follows: "Provided, however, that should the limit of taxation herein named be insufficient the deficit may be made by appropriation from general funds of the State." See Gen. Laws, 35th Leg. (1917), p. 503.

Following the adoption of this amendment, the Legislature in 1919 passed a rural aid law with an appropriation of $4,000,000, the act being similar in principle and in purpose to the one before the court, and in another act appropriation $1,000,000 to become *"a part of the available school fund."* Gen. Laws, 36th Leg. (1919), pp. 105, 135, chaps. 65, 84. The enactment of these two measures was a plain interpretation of the language just quoted from section 3, article 7, as it then existed, and as it now exists, as authorizing appropriations, not only subject to the limition of section 5, article 7, but independent of and not subject to that limitation.

This Legislature, within five days after having thus construed the Constitution, submitted an amendment to sections 3, article 7, containing, in so far as here involved, the identical langue in the then existing section as previously amended, which we have quoted above. Gen. Laws, 36th Leg. (1919), p. 356. This amendment was adopted by the people in November, 1930, after the above legislative and executive constructions of the language employed.

In each of the years 1921, 1923, and 1925, the Legislature passed rural aid acts similar to those previously enacted, and made appropriations therefor (Gen. Laws, First Called Session, 37th Leg. (1921), p. 141, chap. 43; Gen. Laws, 38th Leg. (1923), p. 29, chap. 23; Gen. Laws, 39th Leg. (1925), p. 292, chap. 113). While the last named measure was before the Legislature, and on the very day it was finally enacted, the House voted to submit to the people an amendment to section 3, article 7 of the Constitution, which in so far as herein involved contained the same language as the previous amendment. House Journal, 39th Leg., p. 1702; Senate Journal, 39th Leg., p. 1163. The amendment was adopted by the people in November, 1926. Following the adoption of this amendment, the Legislature in June, 1927, once more passed a rural aid act, similar in purpose and effect to those previously enacted, as well as to the existing law. The 40th Legislature passed an act appropriating $1,000,000 to become a part of *"the available school fund".* Gen. Laws, First Called Session, 40th Leg. (1927), pp. 105, 173, chaps. 36, 62. We thus find that the Legislature again construed the language of the Constitution to mean that it had the power to appropriate from the general funds of the state, and to make the appropriation free from or subject to the limitations of section 5 of article 7.

In July, 1929, the Third Called Session of the 41st Legislature passed the rural aid act under review, as well as an act to supplement in amount the appropriation made by the previous Legislature for the same purpose.

Gen. Laws, Second and Third Called Sessions, 41st Leg. (1929), p. 252, chap. 14, p. 19, chap. 13.

Such in outline is the history of the subject.

The Legislature at eight biennial sessions has interpreted the Constitution as it existed in 1915, and as subsequently amended, as containing no limitation on the right of the Legislature to appropriate money from the general revenue of the state for the support of the public free schools of the state. In the light of this legislative history, as well as that of the executive department of the government in executing the laws referred to, we would not be justified in saying that the constitutional power of the Legislature to pass the law before us did not exist unless we could find in the organic law some plain and unambiguous limitation on the right. 9 Texas Jursprudence, p. 439, sec. 27; 6 Ruling Case Law, p. 62, secs. 59, 63; Cooley's Const. Lim. (8th Ed.), p. 144; Walker v. Meyers, 114 Texas, 225, 232, 266 S. W., 499. There is no such limitation in the Constitution. The limitation in section 5, article 7, declaring that the available school fund "must be appropriated to counties according to scholastic population" has always applied, and now applies, only to the "available school fund", which is clearly defined in that section. Constitutional provisions, like statutes, are properly to be interpreted in the light of conditions existing at the time of their adoption, the general spirit of the times, and the prevailing sentiments of the people. 6 Ruling Case Law, p. 51, sec. 46; Koy v. Schneider, 110 Texas, 369, 378, 218 S. W., 477, 221 S. W., 880; Williams v. Carroll (Texas Civ. App.), 182 S. W., 29; San Antonio Ind. School Dist. v. State (Texas Civ. App.), 173 S. W., 525; 9 Texas Jurisprudence, p. 437, sec. 26, p. 434, sec. 23. The people were acquainted with the benefits of the rural aid law, and thoroughly understood its purposes and operation in 1917, when the constitutional amendment expressly authorizing appropriations from the general funds of the state was submitted and adopted; and a conclusion that by the constitutional amendment of 1917, and the subsequent amendments of section 3, article 7, heretofore referred to, they intended to prohibit the Legislature from continuing the rural aid appropriations in conformity with then existing laws, would not only be unreasonable, but contrary, we believe, to the actual facts.

As has been shown, the Legislature since 1915 has consistently construed the Constitution as permitting the enactment of rural aid measures, and the executive department has approved and executed these laws. The universal rule of construction is that legislative and executive interpretations of the organic laws, acquiesced in and long continued, as in the case before us, are of great weight in determining the validity of any act, *and in case of ambiguity or doubt will be followed by the courts.* 9 Texas Jurisprudence, p. 439, sec. 27; 6 Ruling Case Law, p. 62, secs. 59, 60, 61, 62; Cox v. Robison, 105 Texas, 426, 439, 150 S. W., 1149; G. C. &

S. F. Ry. Co. v. Dallas (Texas Com. App.), 16 S. W. (2d) 292, 294; Greene v. Robison, 117 Texas, 516, 535, 8 S. W. (2d) 655; Theisen v. Robison, 117 Texas, 489, 8 S. W. (2d) 646; Walker v. Meyers, 114 Texas, 225, 266 S. W., 499; Kimbrough v. Barnett, 93 Texas, 301, 55 S. W., 120. In addition, and we think this completely forecloses the matter, the language used in the amendment to section 3, article 7, in 1917, after having been interpreted by the legislative and executive departments as not being subject to the limitation expressed in section 5, has been readopted by the people over and over again during the existence of rural aid statutes. Under a familiar rule of interpretation the readoption of the amendment with the same language formerly employed, without change or limitation, carries with it the meaning which the legislative department had theretofore put upon it. 12 Corpus Juris, p. 717; 6 Ruling Case Law, p. 54; Cox v. Robinson, 105 Texas, 426, 439, 150 S. W., 1149.

We pass now to a consideration of the question as to whether or not the act before us violates the due process and equal protection clauses of the Constitution.

Under our Constitution public education is a division or department of the government, the affairs of which are administered by public officers, and in the conduct of which the Legislature has all legislative power not denied it by the Constitution. State Const., art. 7, art. 3, sec. 42; Cooley's Const. Lim. (8th Ed.), vol. 1, p. 176; 9 Texas Jurisprudence, p. 453, sec. 38; El Dorado Ind. School Dist. v. Tisdale (Texas Com. App.), 3 S. W. (2d) 420; Ferguson v. Academy Consol. Ind. School Dist. (Texas Civ. App.), 14 S. W. (2d) 1051; 24 Ruling Case Law, p. 558, sec. 2.

Under the Constitution our public schools are essentially state schools, and authority to control their operation, except as otherwise provided, is included among the powers conferred upon the Legislature. Webb County v. School Trustees, 95 Texas, 132, 135, 65 S. W., 878; Constitution, art. 7.

Section 1 of article 7 of the Constitution reads: "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."

The purpose of this section as written was not only to recognize the inherent power in the Legislature to establish an educational system for the state, but also to make it the manadtory duty of that department to do so. Associated Schools v. School District, 122 Minn., 254, 142 N. W., 325, 47 L. R. A. (N. S.) 200; Cooley's Const. Lim. (8th Ed.), vol. 1, p. 159; 6 Ruling Case Law, p. 55, sec. 50. The Constitution having made it the mandatory duty of the Legislature "to make suitable pro-

vision for the support and maintenance of an efficient system of public free schools," necessarily conferred the power to make the mandate effective. 9 Texas Jurisprudence, p. 448, sec. 34; Cooley's Const. Lim. (8th Ed.), vol. 1, pp. 138, 139; Story on the Constitution (4th Ed.), sec. 424; Imperial Irr. Co. v. Jayne, 104 Texas, 395, 138 S. W., 575; Dilly County Line Ind. School Dist. v. Burns (Texas Civ. App.), 290 S. W., 279; Morton v. Gordon, Dallam Dig., 396. Since the Legislature has the mandatory duty to make suitable provision for the support and maintenance of an efficient system of public free schools, and has the power to pass any law relative thereto, not prohibited by the Constitution, it necessarily follows that it has a choice in the selection of methods by which the object of the organic law may be effectuated. The Legislature alone is to judge what means are necessary and appropriate for a purpose which the Constitution makes legitimate. The legislative determination of the methods, restrictions, and regulations is final, except when so arbitrary as to be violative of the constitutional rights of the citizen. 6 Ruling Case Law, p. 155, sec. 154. The general and basic classification made by the act before us divided the schools of the state into two classes, namely: small and financially weak school districts, and those which are not so small and weak financially as to need aid to bring their schools up to the average standard of education afforded by our system. This classification undoubtedly has a natural basis, one which actually exists. The inequality of educational opportunities in the main arises from natural conditions. Texas is a large state, with approximately 262,000 square miles of territory, much of it sparsely populated; its lands not equally productive, and the taxable wealth of its communities existing in great inequality. The type of school which any community can have must depend upon the population of the community, the productivity of its soil, and generally its taxable wealth. The constitutional allocation of the available school fund according to the scholastic population of counties has heretofore resulted in the same inequality of opportunity or discrimination that the natural factors produce, and the general purpose of the rural aid act was to relieve in some measure these natural inequalities by appropriations from a source other than the "available school fund" as defined in the Constitution.

Referring now to the basis of the act, that the Legislature has the right to give aid from the general revenue to financially weak schools, we thing the constitutional mandate that the Legislature shall make "suitable provision for the support and maintenance of an efficient system of public free schools", ample authority.

The word "suitable", used in connection with the word "provision" in this section of the Constitution is an elastic term, depending upon the necessities of changing times or conditions, and clearly leaves to the Legislature the right to determine what is suitable, and its determination will

not be reviewed by the courts if the act has a real relation to the subject and object of the Constitution. Marasso v. Van Pelt, 77 Fla., 432, 81 So., 529; Sawyer v. Gilmore, 109 Me., 169, 83 A., 693.

As to whether or not a law secures due process and equal protection as required by the Constitution, depends upon the subject on which it operates and the character of rights which it affects. The constitutional guarantee does not forbid the state from adjusting its legislation to differences in situation. Equal protection of laws is secured if the statutes do not subject the individual to arbitrary exercise of the powers of government. It is well settled that legislation is not open to objection if all who are brought under its influence are treated alike in the same circumstances. 9 Texas Jurisprudence, p. 553, sec. 117. In the very nature of society, with its manifold occupations and contacts, the Legislature must have, and clearly does have, authority to classify subjects of legislation, and when the classification is reasonable,— that is, based upon some real difference existing in the subject of the enactment, and the law applies uniformly to those who are within the particular class, the act is not open to constitutional objection. 9 Texas Jurisprudence, p. 555, sec. 119, p. 558, sec. 120, p. 561, sec. 121.

In classifying subjects so heterogeneous in population, wealth, and physical features as the school districts and communities of Texas, for the purpose of equalizing the educational opportunities which these differences engender, great liberty of action must be accorded the legislative department. A careful reading of the law where involved plainly shows that the Legislature has endeavored with painstaking care to effectuate the avowed object of the act, and in so far as our attention has been directed to the details of the legislation, the classifications made, in connection with a reasonable exercise of the power confided by the organic law to local authorities, are well calculated to achieve the purposes of the act. It is true that equality of educational opportunities for all may not be brought about by the law, but the inequalities which may continue will exist rather by reason of differences in population, wealth, and physical conditions of the school districts or communities, and a failure of local authorities to exercise their constitutional power of taxation, than from the law itself.

Tested by the principles stated, we do not think the act before us in discriminatory, arbitrary, or unreasonable.

That rural aid appropriations have a real relationship to the subject of equalizing educational opportunities in the state, and tend to make our system more efficient, there can be do doubt. It is true that not all schools will be aided, since many, because of large scholastic population and local wealth against which taxes have been levied, may not need the aid, and are therefore not within the purposes of the act. On the other hand, there may be other schools of obviously so few scholastics that any

sufficient aid granted would be out of proportion to the general good to be accomplished, and render it unreasonable to attempt it. Or it may be that there are many communities with a small number of scholastics and large taxable values, like the one in which the complainant Lillie Mae Mumme resides. Her district contains a scholastic population of six children, with taxable values of $188,000. If this district should vote the tax of 75c on the $100 valuation required by subdivision 4, section 2 of the act before us before aid is granted to any school, and to the amount thus produced add the state apportionment from the available school fund, the school would have in han dapproximately $252 per pupil each year, which plainly shows this school does not need state aid.

The results suggested illustrate possible legislative reasons for declining to aid small schools (with less than 20 scholastics), unless because of lack of wealth they were unable to maintain a uitable school; in which event they may receive aid under sections 3 and 6 of the act. The law clearly evinces the legislative purpose to aid every school, regardless of number of scholastics, where aid is necessary and practicable.

Nor do we think the details of the act, fixing the conditions and qualifications of districts within the general classification entitling them to aid, discriminatory, because these apply alike to all within the classification. 9 Texas Jurisprudence, p. 555, sec. 119, and other authorities supra.

Nor are the requirements exacted of those who apply for aid arbitrary or unreasonable. Those sections of the law regulating the type of school house required, the equipment necessary, the courses of study to be pursued, and which require obedience to the lawful rulings of the state superintendent and the board of education, are certainly reasonable requirements, and clearly within the legislative power. 24 Ruling Case Law, p. 559, sec. 3, p. 633, sec. 92, p. 635, sec. 93; Associated Schools v. School Districts, 122 Minn., 254, 142 N. W., 325, 47 L. R. A. (N. S.) 200, and notes; Pasadena City School District v. City of Pasadena, 166 Cal., 7, 134 Pac., 985, 47 L. R. A. (N. S.) 892, 895, Ann. Cas., 1915B, 1039.

The provisions of the act (sections 5, 7, and 11) with reference to the number of teachers to be employed in ratio to the number of scholastics have for their purpose both economy and efficiency in the maintenance of the school. The salary requirements (sections 4 and 11) have the same purpose, namely: that the salary shall be large enough to attract efficient teachers and justify teachers of this character to prepare for that profession, and yet not so large as to be extravagant or out of line with compensation generally received for services of this high character. These provisions are well calculated to promote uniformity in character of instruction, and therefore equality of opportunity for the students,—one of the named purposes of the act. These provisions are plainly within the general power which the Legislature has over public schools. 24 Ruling

Case Law, p. 559, sec. 3, p. 562, sec. 6, p. 612, sec. 69; Bopp v. Clark, 165 Iowa, 697, 117 N. W., 172, 52 L. R. A., 493.

The provision of the law that a school shall not be eligible to receive rural aid until it votes a tax of 75c on the $100 valuation of the taxable property of the district, is not an unreasonable requirement, because well below the maximum permitted by the Constitution and laws of the state. It may be voted or not, as determined by the taxpayers themselves. Nor is it discriminatory, since it applies to all districts alike which apply for aid.

Complaint is also made of the appropriation in section 10 of the act of $400,000 to supplement the amount otherwise available to pay the tuition of high school students transferred from one district to another, as provided for in chapter 181, Gen. Laws, Regular Session of the 40th Legislature (1927), which act has since been amended. Gen. Laws, First Called Session, 41st Leg. (1929), chap. 2. We do not think this section discriminatory, arbitrary, or unreasonable. Its object is to equalize educational opportunities, and to save the expense of maintaining additional high schools. The classification is reasonable, and applies alike to all schools and students similarly situated. Certainly the State has the power to establish and maintain *high schools* as a part of its public free school system. 24 Ruling Case Law, p. 557; Richards v. Raymond, 92 Ill., 612, 34 Am. Rep., 151; People et rel. Goodell v. Chicago & N. W. Ry. Co., 286 Ill., 384, 121 N. W., 731; Boggs v. School Tp. of Cass, 128 Iowa, 15, 102 N. W., 796. Having this major power, the minor power to permit the transfer of high school pupils into a district having such a school, with facilities in excess of its own requirements, and pay the additional tuition required therefor, follows as a matter of common sense. We know that not every community has the wealth of population sufficient to justify the maintenance of a high school, and the law in this respect was enacted for the purpose of equalizing educational opportunities in an economical way. It is not unjust or unreasonable, and does not discriminate against any one of the class to which it applies. The act in this respect is clearly within the legislative power. 24 Ruling Case Law, p. 626, sec. 84.

We have today, in an opinion in the case of Thomas B. Love, as Next Friend of Neota Camp, a Minor, et al. v. City of Dallas, 120 Texas, 351, 40 S. W. (2d) 20, construed the high school tuition law, and as interpreted by us have sustained its validity. The opinion in the instant case on this subject is to be read and its meaning determined in connection with the opinion in the Love case.

We have given careful consideration to all questions presented in the application, and have concluded that the Court of Civil Appeals correctly disposed of the case. The application for writ of error is accordingly refused.