*887 JUSTICE GUZMAN,
joined by JUSTICE LEHRMANN, concurring.

“It is ■easier to build strong children than to repair broken men.”

—Frederick Douglass
A strong public education system is fundamental to building strong children. Regrettably, this lawsuit — the most recent salvo in a long-waged battle over public-school funding — signals widespread dissatisfaction with the current system for financing public education in Texas. The majority of school districts — some property-rich, some property-poor — are joined by various individuals, organizations, charter schools, students, and parents in challenging the school-finance system’s constitutionality. The suit marries novel arguments based on new standards of “qualitative efficiency” and accountability with more familiar ones, including allegations that the system imposes an unconstitutional property tax and is constitutionally inadequate, unsuitable, and inefficient.[1] Although disparate in their grievances, the parties are united in the firm conviction that the system is broken. Today, the Court holds Texas’s school-finance system passes the threshold of constitutionality. But this is not an endorsement of the system; to the contrary, the Court calls for “transformational, top-to-bottom reforms.”[2] I fully join the Court’s opinion and write separately to further emphasize that there is much more work to be done, particularly with respect to the population that represents the majority of the student base — economically disadvantaged students.[3]
I
Our state constitution is a marvel — the intentional design of the people of Texas— but its very length and detail is a testament to the core belief that our state government, including the Legislature, must be guided and limited in the exercise of its power and discretion. The Legislature may devise and adopt highly complex laws and systems, but its enactments can and must be measured against the requirements of the charter that established its authority to govern and defines its powers and duties. In the checks and balances of our political system, the Legislature’s powers are not unfettered. Those aggrieved by legislative action are not entirely without recourse and may, in a proper case, seek judicial review.' While the Legislature has the duty and privilege to balance the myriad policy choices inherent in adopting and financing an educational system that serves the diverse citizenry of this vast state, this Court is charged with determining whether the sum of those choices passes constitutional muster.
The power of the courts is not unbounded, however. We can review, but not rewrite, the Legislature’s enactments; we can only grade pass or fail, yes or no. As the Court explains, here and in our prior cases, article VII, section 1 of the Texas Constitution affords the Legislature great discretion.[4] “The public education system need not operate perfectly; it is adequate *888 if districts are reasonably able to provide their students the access and opportunity the district court described.”[5] Because our review, is and must be- “very deferential” [6] to the Legislature, I agree the Court is obliged to conclude the system passes muster under article VII, section 1 of the Texas Constitution. The standard that governs our review is not whether the state educational and school-finance system is ideal; the constitution merely requires the system to be good enough.
Good enough now, however, does not mean that the system is good or that it will continue to be enough. ■ Shortfalls in both resources and performance persist in innumerable respects, and a perilously large number of students is in danger of falling further behind. In the last fifteen years, the number of economically disadvantaged students served by Texas schools has risen significantly and continues to outpace increases in the overall student population.[7] Statistics. show these students — close to 60% of the student populace[8] — have made performance gains but still underperform academically in comparison to their rnpre affluent peers. The majority of Texas school children are presently categorized as- economically disadvantaged, and that majority is likely to grow. Enrollment data shows higher concentrations of economically disadvantaged students in lower grades and an oncoming population bulge among younger children.[9]
Low-income' students come to school without the advantages enjoyed by many of their classmates, often without the same life experiences and frame of reference as • more affluent students. Poor children may never have been more than a few blocks away from home, never had access to computers or visited a museum. Their families, often lacking the means to provide academic support and stability, are struggling to provide their children with reliable nutrition, health care, housing, and transportation and, as a result, may move often. Once in school, low-income children are frequently without the opportunity, means, or transportation for extracurricular activities, after-school tutoring, summer school, or other enrichment activities. As the Court concedes, there are conflicting studies on whether family characteristics like socioeconomic status or parental education matter more to student success than expenditures.[10] The mandate to the Legislature, however, comes not from those studies or from the courts. The mandate comes from the Constitution, from framers who presumably anticipated the need to educate children who would not otherwise be able to participate meaningfully in the State’s affairs.
To capitalize on the progress that has been achieved to date and to guard against *889 fallow, the Legislature must continue to be strategic and flexible in its approach to supporting economically disadvantaged students. The process will take time, ingenuity, and refinement as more information becomes available, but the economic future of this great state lies in the hands of our children, and educating them must be our first priority. While perfection is neither attainable nor constitutionally required, our Legislature can and should continue to strive for a better system for all Texas students.
II
As the Court observes, the Legislature has implemented a variety of methods to address the systemic needs of economically disadvantaged students. The Legislature has provided an additional per-student allotment for economically disadvantaged students, computed by multiplying these students’ average daily attendance by a factor of .2. Lately, legislative solutions have centered on controversial new testing and reporting requirements. Charter schools, a once-popular suggestion for innovation, remain an experiment in progress, and in this litigation, charter schools are among those claiming that more money is necessary to provide an adequate system. Consolidation of school districts, on the other hand, seems to be an unpopular idea, but a few school districts have consolidated since this Court last noted the inefficiency created by a “multitude” of small school districts.[11]
The Legislature has also employed targeted grant programs to fund full-day prekindergarten. In a report to the Legislature, former Commissioner of Education Robert Scott recommended full funding for prekindergarten “early start” grants, describing it as a “critical”' program that supports student progress from prekindergarten through the twelfth grade. Economically disadvantaged students may lag as much as eighteen months behind their peers when they enter kindergarten, but this gap can be cut in half with an effective prekindergarten program. In 2011, however, the Legislature eliminated grant funding in its entirety, cutting what at one time had been some $200 million per biennium in targeted grants for full-day prekindergarten. Some funding was restored in 2013, but the amount — $30 million per biennium- — was only 15% of the pre-2011 level. Districts with a high level of need, but few financial resources, remain hampered in their ability to serve their disadvantaged students. Edgewood ISD presents a case in point: more than 90% of its students are economically disadvantaged, and the District lacks the $1.2 million necessary to serve the children on its prekindergarten waitlist. These children remain at risk of falling further and further behind.
Ill
While there has been progress over the last twenty years, the need for more is apparent. A number of measures show a continuing gap between economically disadvantaged students and students overall, including the four-year graduation statistics cited, in part, by the Court. Four-year graduation and dropout statistics track students who started together in the same ninth-grade cohort over four years to determine what percentage of those students graduate, drop out, or continue in school.[12] Four-year dropout rates, by defi- *890 niton, do not include students who dropped out before ninth grade.[13] As the Court notes, Texas had an overall four-year graduation rate of 88% in 2013; the corresponding dropout rate was 6.6%. In other words, 21,634 of twelfth-grade students who started ninth grade together, four years earlier, dropped out in 2013.[14] For economically disadvantaged students, the four-year graduation rate was lower, at 85.2%, while the dropout rate was higher, at 8.5%.[15] Thus, a disproportionate share of the students who dropped out, after failing to graduate in 2013, were poor. Economically disadvantaged students continued to lag behind in 2014, with four-year graduation and dropout rates remaining roughly the same.[16]
In any event, graduation is only half the battle. Graduation in itself means little if it is not a meaningful hallmark for achievement. The State’s current measure of achievement — STAAR test results — shows an ongoing achievement gap between students overall and economically disadvantaged students. In 2013, 71% of all fourth graders met the first “phase-in” STAAR level for reading proficiency, but only 63% of economically disadvantaged fourth graders fared as well.[17] In 2014, the corresponding numbers were 73% and 65%; in 2015, they were 71% and 62%.[18] Reading test results for other grades show similar performance divides. Annual “Report Cards” also show a disparity in the percentage of students who could meet what will be the “final” proficiency levels, once STAAR testing is fully “phased-in.” In 2013, 34% of all students, for all subjects, could meet these “final” proficiency standards; only 25% of economically disadvantaged students could.[19] In 2014, the divide is 39% to 28%; in 2015, 38% to 27%.[20] The performance gap between all students and students who are economically disad *891 vantaged persists, even as economically-disadvantaged students grow to be a larger and larger percentage of the total student population.
A more pressing concern is the risk that performance gains achieved over the last decade are eroding. The Court notes, as a high point among otherwise lackluster NAEP test results, that average mathematics scores for all Texas eighth graders rose from 281 to 290 between 2005 to 2011.[21] That 2011 high point, however, was not repeated in succeeding years.[22] Average eighth-grade mathematics scores dropped to 288 in 2013 and to 284 in 2015. The NAEP comparison tool, in fact, shows no significant gain in average mathematics results for Texas eighth graders from 2005 to 2015.[23] Average mathematics scores for economically disadvantaged eighth graders also dropped-from 281 in 2011, to 279 in 2013, to 274 in 2015; on the bright side, the 2015 score still represents a ten-point gain over the average score from 2003. NAEP reading test results for eighth graders are more stable-if only because there have been no significant recent gains to lose.[24]
What may be far more interesting about the NAEP data is that it shows a much wider achievement disparity between students who are poor and those who are not. For mathematics scores, the gap between non-disadvantaged . and disadvantaged eighth graders was 23 points in 2011, and 22 points in 2015, but scores dropped for both groups. The gap in reading scores— less stellar all around — was 21 points in 2011 and 20 points in 2015.[25]
If we chose to grade Texas in comparison to other states, we could definitely say Texas is not the worst. In 2015, Texas placed 7th on math scores for economically disadvantaged eighth graders — significantly better than 26 states and the District of Columbia. On reading scores for this group, however, Texas placed 37th — significantly better than only four states- and the District of Columbia. On results for all students in 2015, Texas ranked 23rd on math scores (significantly better than 19 states and DC) and 39th on reading scores (significantly better than only four states *892 and DC). It may be enough, for now, but we should aspire to more than being solidly in the middle.
IV
Constitutionality is a minimum standard — a guarantee — -not a cap on our expectations or our potential. Eleven years after our last school finance case, it still “remains to be seen whether the system’s predicted drift toward constitutional inadequacy will be avoided by legislative reaction to widespread calls for change.”[26] At the beginning of the day and in the end, only the Legislature can develop and implement new solutions, new efficiencies, and new ideas for funding public-school education. Our citizens must bear the consequences of those decisions, and I, for one, remain hopeful that more progress is ■ yet to come.
JUSTICE BOYD,
joined by JUSTICE LEHRMANN and JUSTICE DEVINE, concurring.
Our decision in this case will no doubt be a great disappointment to many, and perhaps a cause for celebration for others. In light of this Court’s extensive and binding precedent, what it should not be is a surprise to anyone. And what it definitely is not is an expression of personal opinions on how Texas should fund and operate its public school system. I join the Court’s opinion and judgment and write this brief concurrence to emphasize why our Constitution and this Court’s precedent require today’s result.
The Texas Constitution states:
A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.
Tex. Const, art. VII, § 1. Over the past twenty-seven years, this Court has repeatedly and extensively addressed, construed, and applied these words.[1] The arguments the parties raised in those cases required the Court to focus particularly on the phrases “general diffusion of knowledge,” “suitable provision,” and “effh cient system.” But in doing so, the Court has repeatedly highlighted one phrase that others seem to often overlook:
“ ... it shall be the duty of the Legislature ...”
These eight powerful words directly affect all of the words surrounding them. More importantly, they affect this Court by precluding us from judicially mandating the “efficient system,” “suitable provision,” or “general diffusion of knowledge” we may prefer. And most importantly, they affect the members of the Legislature by imposing on them a solemn obligation on which the very “liberties and rights of the people” depend.
Based on the Constitution’s language, a “general diffusion' of knowledge” is the linchpin for all of the other requirements. Article VII, section 1 makes it “the duty of the Legislature” to ensure a “general diffusion of knowledge”- — no more and no less. Tex. Const, art. VII, § 1. A “gener *893 al diffusion of knowledge” is the mark on the yardstick that indicates whether the Legislature has made “suitable provision” for an “efficient system” of public schools. See West Orange-Cove II, 176 S.W.3d at 785-86. The Legislature, and even individual school districts, may choose to tax and spend and provide and require more than a “general diffusion of knowledge” requires, see West Orange-Cove I, 107 S.W.3d at 581-83; Edgewood IV, 917 S.W.2d at 730 & n. 9, but they cannot choose to do less. A “general diffusion of knowledge” is the constitutional minimum requirement that is essential to preserving “the liberties and rights of the people.”
But what is a “general diffusion of knowledge”? The Constitution does not say. Nor does it say what constitutes “suitable provision” or an “efficient system.” Since it is typically this Court’s role to construe the Constitution, see, e.g., Harris Cty. Hosp. Dist. v. Tomball Reg’l Hosp., 283 S.W.3d 838, 842 (Tex.2009), we could conceivably assign meanings to these terms that would ensure that Texas has the kind of public school system we think it should have. Conceivably, we could; but constitutionally, we cannot, because:
“ ... it shall be the duty of the Legislature ...”
The Court has previously noted that the terms “general diffusion of knowledge,” “suitable provision,” and “efficient system” are inexact, imprecise, and “import a wide spectrum of considerations.” West Orange-Cove II, 176 S.W.3d at 778; see also Edgewood I, 777 S.W.2d at 394 (“[Tjhese are admittedly not precise terms.... ”). We observed long ago that the meaning of these “elastic” terms depends “upon the necessities of changing times or conditions.” Mumme v. Marrs, 120 Tex. 383, 40 S.W.2d 31, 36 (1931). By using these elastic and imprecise terms and by expressly placing “the duty” on the Legislature, article VII, section 1 “commits to the Legislature, the most democratic branch of the government, the authority to determine the broad range of policy issues involved in providing for public education.” West Orange-Cove II, 176 S.W.3d at 778. The terms are intentionally imprecise because “the State’s provision for a general diffusion of knowledge must reflect changing times, needs, and public expectations.” Edgewood IV, 917 S.W.2d at 732 n. 14.
Because the standards that these terms set can be met only through fiscal and public policy choices, the Court has held that the Legislature has the primary responsibility to determine what each of these standards require and how best to meet them:
• “The Legislature is entitled to determine what public education is necessary for the constitutionally required ‘general diffusion of knowledge, [’] and then to determine the means for providing that education.” West Orange-Cove II, 176 S.W.3d at 784 (emphasis added).
• “The word ‘suitable,’ used in connection with the word ‘provision’ ... clearly leaves to the [Ljegislature the right to determine what is suitable, and its determination will not be reviewed by the courts if the act has a real relation to the subject and object of the Constitution.” Mumme, 40 S.W.2d at 36 (emphases added).
• “The Constitution gives to the Legislature ... the ‘primary responsibility to decide how best to achieve an efficient system.’ ” Edgewood IV, 917 S.W.2d at 747 (emphasis added) (quoting Edgewood I, 777 S.W.2d at 399).
In other words, the Constitution allows the Legislature “a large measure of discretion on two levels” — both to determine what the constitutional terms mean and require, *894 and then to determine how to best meet those requirements. West Orange-Cove II, 176 S.W.3d at 784. In short, the Legislature “has broad discretion to make the myriad policy decisions concerning education.” Edgewood IV, 917 S.W.2d at 780 n. 8.
Despite the Constitution’s express assignment of “the duty” to the Legislature, it does “provide a standard by which this court must, when called upon to do so, measure the constitutionality of the legislature’s actions.” Edgewood I, 777 S.W.2d at 394. However, our role “is limited to ensuring that the constitutional standards are met. We do not prescribe how the standards should be met.” West Orange-Cove II, 176 S.W.3d at 753. Instead, we must defer to the Legislature and uphold its policy choices unless those choices are “arbitrary” and “unreasonable.” As the Court explained long ago,
Since the Legislature has the mandatory duty to make suitable provision for the support and maintenance of an efficient system of public free schools, and has the power to pass any law relative thereto, not prohibited by the Constitution, it necessarily follows that it has a choice in the selection of methods by which the object of the organic law may be effectuated. The Legislature alone is to judge what means are necessary and appropriate for a purpose which the Constitution makes legitimate. The legislative determination of the methods, restrictions, and regulations is final, except when so arbitrary as to be violative of the constitutional rights of the citizen.
Mumme, 40 S.W.2d at 36.
Under this standard, the Court must defer to the Legislature’s primary role and uphold the Legislature’s decisions unless they are arbitrary — that is, “taken without reference to guiding rules or principles”— and unreasonable. West Orange-Cove II, 176 S.W.3d at 784. “If the Legislature’s choices are informed by guiding rules and principles properly related to public education — that is, if the choices are not arbitrary — then the system does not violate the constitutional provision.” Id. at 785. Under our Constitution, the Legislature is free to make whatever changes it determines are appropriate in light of “changing times, needs, and public expectations.” Edgewood IV, 917 S.W.2d at 732 n. 14. It can change the required curriculum; it can replace the TAAS test with the TAKS test and the TAKS test with the STAAR test; it can change -the scores required to “pass” whatever test it has settled on; it can change the accreditation standards and adjustment factors and remedial measures; and it can even reduce funding by $4 billion. We may not like what the Legislature does, but we can only intervene as a Court if the Legislature’s decisions are “arbitrary” and “unreasonable” in light of its “duty” to ensure a “general diffusion of knowledge.”
The Legislature has never expressly defined or described a “general diffusion of knowledge.” Instead, it has only implicitly set that bar by statutorily describing the system it has chosen to establish, support, and maintain. The Court has thus looked to the statutes the Legislature has enacted for guidance. In Edgewood IV, for example, the Court concluded that, in Chapter 35 of the Texas Education Code, “the Legislature defines the contours of its constitutional duty to provide a ‘general diffusion of knowledge’ by articulating seven public education goals.” Edgewood IV, 917 S.W.2d at 728. And more recently, the Court equated a “general diffusion of knowledge” with an “accredited education” because the Legislature requires school districts to provide the latter as the means to achieve the former. West Orange-Cove I, 107 S.W.3d at 581. Consistent with the *895 Legislature’s statutory scheme, the system “need not operate perfectly; it is adequate if districts are reasonably able to provide their students the access and opportunity” the system is designed to provide. West Orange-Cove II, 176 S.W.3d at 787.
The Court has not previously concluded, and does not conclude today, that the Legislature’s decisions in the school-finance arena have been wise or desirable. All the Court concludes today is that they have not been so arbitrary and unreasonable as to fall below the minimum constitutional standards. The Court’s sole job — indeed, its constitutionally limited authority' — is to answer that question. Whether we believe the state should spend more or less on public education is irrelevant to the task before us. Whether we think the state should raise or lower accreditation standards, increase or decrease class sizes, or require more or less testing, is immaterial to thé decision the Constitution and our precedent permit us to make today. We may have our personal views on those issues, but when it comes to making those kinds of choices,
“ ... it shall be the duty of the Legislature ...”
Deciding to provide a “better” system, and how much “better” that system should be, requires a balancing of costs and benefits that the Constitution leaves solely to the Legislature. Our sole authority is to determine whether the Legislature’s decisions have been arbitrary and unreasonable, and for the reasons the Court explains, I agree they have not. For those who are disappointed, their remedy “lies in the Legislature and thus in the privilege and duty that all Texans have to elect the legislators who will implement the policy choices they desire.” Ante at 868.

. See Tex. Const, art. VII, § 1; id. art. VIII, § 1-e.

. Ante at 833-34.

. Economically disadvantaged students are those eligible to participate in the national free or reduced-price lunch program. See Tex Educ. Code § 5.001(4). For a household with four members, the qualifying annual income is $44,863 or less for 2015-2016 and $44,123 for 2014-2015. 80 Fed.Reg. 17,026, 17,027 (March 31, 2015); 79 Fed.Reg. 12,-466, 12,467 (March 5, 2014).

. Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist., 176 S.W.3d 746, 784 (Tex.2005).

. Id. at 787.

. Ante at 845-46.

. Division of Research & Analysis, Tex. Educ. Agency. Enrollment in Texas Public Schools 2014-15 (2016) (Doc. No. GE16 601 09), available as a PDF file through links on the agency's Enrollment Trends webpage, at . http://tea.texas.gov/acctres/enrolLindex.html.

. Id. at ix-x.

. Id. at 10, 20; Division of Research & Analysis, Texas Educ: Agency, Enrollment in Texas Public Schools 2013-14 at ix, 15, 20 (2014) (Doc. No. GE15 601 03), available as a PDF file at http://tea.texas.gov/acctres/enroll_ index.html; see also Steve Suitts, A New Majority Research Bulletin: Low Income Students Now a Majority in the Nation's Public Schools, Southern Education Foundation (2015), available as a PDF file athttp://www.southerneducation.org/ Our-Strategies/Research-and-Publications/ New-Majority-Diverse-Majority-Report- ' Series/A-New-Majority-2015-Update-Low-Income-Students-Now.

. Ante at 860.

. Neeley, 176 S.W.3d at 757; Edgewood Indep. Sch. Dist. v. Kirby, 804 S.W.2d 491, 497 (Tex.1991).

. Division of Research & Analysis, Tex. Eddc. Agency, Secondary School Completion and Dropouts in Texas Public Schools 2012-13 at x (2014) (Doc. No. GE14 601 07) (“COMPLE *890 TION AND DROPOUTS 2012-13”), available as a PDF file from the agency’s Completion, Graduation, and Dropouts webpage at http:// tea.texas.gov/-acctres/dropcomp_index. html# reports.

. Dropouts are also counted annually. Of the 2,189,442 students who attended seventh through twelfth grades during the 2012-2013 school year, 31,509 students dropped out of the ninth through twelfth grades, and another 3,187 students dropped out of the seventh and eighth grades. Id. at xiv.

. Grade 9 Longitudinal Graduation and Dropout Rates, Texas Public Schools, Class of 2013, Tex. Educ. Agency, https://rptsvrl.tea. texas.gov/acctres/completion/2013/state.html; see also Completion and Dropouts 2012-13 at xii.

. Grade 9 Longitudinal Graduation and Dropout Rates by Race/Ethnicity and Gender, Texas Public Schools, Class of 2013, Tex. Educ. Agency, https ://rptsvrl .tea.texas.gov/acctres/ completion/2013/state_ demo.html. Another 5.4% of economically disadvantaged students continued in school and another .9% received a GED. Id.

. Compare Grade 9 Four-Year Longitudinal Graduation and Dropout Rates, Texas Public Schools, Class of 2014, Tex. Educ. Agency, https://rptsvrl.tea.texas.gov/acctres/ completion/2 014/state_4yr.html, with Grade 9 Four-Year Longitudinal Graduation and Dropout Rates, by Race/Ethnicity, Economic Status, and Gender, Texas Public Schools, Class of 2014, Tex. Educ. Agency, https://rptsvrl.tea. texas.gov/acctres/completion/2014/state_ demo_4yr.html.

. The "2012-13 Federal Report Card” can be found on the TEA's website, at https:// rptsvrl.tea.texas.gov/-perfreport/frc/2013/ srch.html.

. The "2014-15 Federal Report Card” can be found through the TEA’s website at https:// rptsvrl.tea.texas.gov/-perfreport/frc/2015/ srch.html.

. See 2012-13 Federal Report Card.

. See 2014-15 Federal Report Card.

. Ante, at 867. The National Assessment of Educational Progress (NAEP) is a congres-sionally-mandated project administered by the National Center for Education Statistics (NCES), with the Department of Education and the Institute of Education Sciences. Reading and mathematics test results for fourth and eighth graders, as well as various tools for viewing a state's profile, intra-state score changes, and standing relative to other states, are available for 2015 and several earlier years at http://www.nationsreportcard. gov/.

. The NCES provides a “State Profiles” online tool that can be used to generate a state’s test result history dating back to 1990, available at http://nces.ed.gov/nationsreportcard/ states/. An interactive "State Comparison” tool can be used to generate tables, by year, grade, and test subject, to obtain more data about scores across several categories of students. See Nat’l Ctr. for Educ. Statistics, NAEP State Comparisons, http://nces.ed.gov/ nationsreportcard/-statecomparisons.

. The "State Score Changes” comparison tool on the Nation’s Report Card webpage can be used to compare fourth- and eighth-grade mathematics and reading scores from 2015 to results from past years ranging back to 1990.

. See 2015 Mathematics and Reading Assessments; Reading; State Score Changes; State Score Change Map, The Nation's Report Card, an interactive tool available at http://www. nationsreportcard.gov/reading_math_2015/-#reading/state/scores?grade=8. The tool provides a link to toggle between fourth- and eighth-grade results.

. A table showing this data for each year, subject, and grade can be generated with the NCES comparison tool available at http:// nces.ed.gov/nationsreportcard/state comparisons.

. Neeley, 176 S.W.3d at 790.

. See Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist., 176 S.W.3d 746 (Tex.2005) (West Orange-Cove II ); W. Orange-Cove Consol. I.S.D. v. Alanis, 107 S.W.3d 558 (Tex.2003) (West Orange-Cove I ); Edgewood Indep. Sch. Dist. v. Meno, 917 S.W.2d 717 (Tex.1995) (Edgewood IV ); Carrollton-Farmerś Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist., 826 S.W.2d 489 (Tex.1992) (Edgewood III ); Edgewood Indep. Sch. Dist. v. Kirby, 804 S.W.2d 491 (Tex.1991) (Edgewood II ); Edgewood Indep. Sch. Dist. v. Kirby, 777 S.W.2d 391 (Tex.1989) (Edgewood I ).