OFFICE OF
THE ATTORNEY GENERAL



PRICE DANIEL
ATTORNEY GENERAL

Hon. George Moffett, Chairman
State Affairs Committee
Texas Senate
Austin, Texas

Dear Sir:                    Opinion No. V-31

                   Re:  Constitutionality of Senate
                        Bill No. 140, establishing
                        a statutory university for
                        negroes, and related ques-
                        tions.

     On behalf of the State Affairs Committee of the Senate,
you have submitted a copy of Senate Bill No. 140, providing
for the establishment of a negro university, together with
the following question:

          "Is Senate Bill No. 140, in the form
          attached hereto, constitutional?  If
          not, the Committee would be pleased
          to have your department point out
          amendments or deletions which would
          bring said Bill into conformity with
          the Constitution of this State."

     The subject and purpose of the proposed bill is stated
in the caption as follows:

          "An Act providing for the establish-
          ment, support, maintenance, and direc-
          tion of a University of the first class
          for the instruction and training of the
          colored people of this State in all
          courses of instruction taught at The
          University of Texas and its branches
          to be known as 'The Texas State Univer-
          sity for Negroes' and to be located at

> Houston, Harris County; and providing
> for an Agricultural and Mechanical
> College for colored students to be
> known as 'The Prairie View Agricul-
> tural and Mechanical College' as same
> is now located at Prairie View, Waller
> County; making an appropriation; and
> declaring an emergency."

To fully comply with your request, it is necessary to examine the provisions of the Texas Constitution and the Constitution of the United States, and to review the background and interpretations thereof as applied to the field of higher education for negroes in this State. Therefore, you will pardon the necessary length of this opinion.

## TEXAS CONSTITUTIONAL PROVISIONS

Under the Texas Constitution, public education is a division or department of the government, in the conduct of which the Legislature has all legislative power not denied it by the Constitution. (Mumme, et al vs. Marrs, Texas Supreme Court, opinion by Judge Cureton, 40 S. W. (2d) 31). Section 1 of Article VII, of the Constitution of Texas, reads as follows:

> "A general diffusion of knowledge being
> essential to the preservation of the lib-
> erties and rights of the people, it shall
> be the duty of the Legislature of the
> State to establish and make suitable pro-
> vision for the support and maintenance of
> an efficient system of public free schools."

Section 48 of Article III of the Texas Constitution empowers the Legislature "to levy taxes or impose burdens upon the people" to raise revenue for many purposes, among them the following:

> "The support of public schools, in which
> shall be included <u>colleges</u> and <u>universi-</u>
> <u>ties</u> established by the State; . . ."
> (Underscoring ours)

From the above it is clear that the Legislature of Texas has the power to provide for the establishment and

operation of a negro university as contemplated by Senate
Bill 140, unless there is some other constitutional pro-
vision which prohibits such action or directs that it be ac-
complished in a different manner.  That brings us to an ex-
amination of Section 14 of Article VII, of the Constitution
of Texas, the only other constitutional provision relating
directly to this question.  It reads as follows:

> "Sec. 14.  Branch University for
> Colored.--The Legislature shall also
> when deemed practicable, establish
> and provide for the maintenance of a
> College or Branch University for the
> instruction of the colored youths of
> the State, to be located by a vote of
> the people; Provided, that no tax
> shall be levied, and no money appro-
> priated, out of the general revenue,
> either for this purpose or for the
> establishment, and erection of the
> buildings of the University of Texas."

Immediately we are faced with the question of whether the
University contemplated by Senate Bill 140 is the same as that
contemplated by the writers of the above Section of the Con-
stitution in 1876.  Is it to be a College (integral part of a
university) or a Branch of the University of Texas?  Does the
Legislature by this Bill "deem it practicable" to provide for
the establishment and maintenance of such College or Branch
out of the available fund accruing from the Permanent Univer-
sity Fund and without aid of taxes and appropriations from the
General Revenue as would be required by the above section of
the Constitution?  We think the answer is "no" to both of these
questions.  It is clear from a reading of Senate Bill 140 that
the proposed negro university is not to be a College or Branch
of The University of Texas.  Its passage would evidence no in-
dication that the Legislature "deems it practicable" to estab-
lish and maintain such University under the limitation as to
use of taxes and general revenue for such purpose.  On the
contrary, passage of Senate Bill 140 would indicate that an
entirely separate university for negroes is to be established
free and independent of The University of Texas with full right
to establishment, maintenance and erection of buildings out of
the General Revenue Fund of the State.

This conclusion forces the question of whether the Legis-
lature, having been authorized when "deemed practicable" to
establish a negro university in the manner set out in Section
14 of Article VII of the Constitution, can lawfully adopt a

different method and establish a different school out of other State funds. In other words, does the above section of our Constitution limit the manner of establishing a negro school of higher learning to the procedure and funds provided therein? If so, the statutory school proposed in Senate Bill 140 is unconstitutional, and the only means of creating a negro university in Texas is to establish it as a College or Branch of The University of Texas without appropriations from the general revenue, and its location must be in Austin, the city chosen for such college or branch by a vote of the people in 1882. If not, Senate Bill 140 is constitutional, and the negro university may be established out of general revenue and at any location desired by the Legislature.

We are familiar with the rule of law that a constitutional provision as to how a thing shall be done constitutes an implied prohibition of its being done in any other manner. However, when the constitutional provision is not mandatory but leaves discretion with the Legislature as to when, if and how a thing is to be done, it should never be construed as a limitation by implication on the general power of the Legislature to accomplish the desired end in another manner. Especially is this true in the present case where another constitutional provision (Section 48, Article III) written in the same Convention, expressly recognizes the power of the Legislature to establish and operate other colleges and universities in another manner.

Constitutional provisions, like statutes, are properly to be interpreted in the light of conditions existing at the time of their adoption, the general spirit of the times and the prevailing sentiments of the people. (Mumme vs. Marrs, supra) The universal rule of construction is that legislative and executive interpretations of the organic law, acquiesced in and long continued are of great weight in determining the validity of any Act; and in case of ambiguity or doubt will be followed by the courts. 9 Tex. Jur. 439, 6 R. C. L. 62, Mumme vs. Marrs, supra. To understand the intention of the writers of the Texas Constitution and the legislative and executive interpretations of the question since 1876, it is necessary that we review the history of the educational articles of the Texas Constitution.

### HISTORY AND INTERPRETATIONS OF SECTION 14, ARTICLE VII, AND SECTION 48, ARTICLE III, CONSTITUTION OF TEXAS:

The Constitution of 1866 provided generally for a system of education, including "Africans and their children." The Constitution of 1869 made no provision for a University of any character. In 1871, taking advantage of a Federal land grant, the Agricultural and Mechanical College was established by statute and located near Bryan, Texas.

The Constitutional Convention of 1875, headed by E. B. Pickett (who later became the President of the Board of Directors of the Agricultural and Mechanical College) undertook among other things, to provide for the establishment of public free schools and institutions of higher learning. That body proposed the document which became the Constitution of 1876. The pertinent educational provisions still exist in the original form in Article III as quoted hereinabove and in Article VII, as follows:

> "Sec. 10. The Legislature shall as soon as practicable establish, organize and provide for the maintenance, support and direction of a University of the first class, to be located by a vote of the people of this State, and styled, 'The University of Texas', for the promotion of literature, and the arts and sciences, including an Agricultural, and Mechanical department.

> "Sec. 11. In order to enable the Legislature to perform the duties set forth in the foregoing Section, it is hereby declared that all lands and other property heretofore set apart and appropriated for the establishment and maintenance of The University of Texas, together with all the proceeds of sales of the same, heretofore made or hereafter to be made, and all grants, donations and appropriations that may hereafter be made by the State of Texas, or from any other source, shall constitute and become a permanent University Fund. . . .

> "Sec. 13. The Agricultural and Mechanical College of Texas, established by an Act of

the Legislature passed April 17th, 1871, located in the County of Brazos, is hereby made, and constituted a Branch of The University of Texas, for instruction in Agriculture, the Mechanic Arts, and the Natural Sciences connected therewith. And the Legislature shall at its next session, make an appropriation, not to exceed forty thousand dollars, for the construction and completion of the buildings and improvements, and for providing the furniture necessary to put said College in immediate and successful operation.

"Sec. 14. The Legislature shall also when deemed practicable, establish and provide for the maintenance of a College or Branch University for the instruction of the colored youths of the State, to be located by a vote of the people: Provided, that no tax shall be levied, and no money appropriated, out of the general revenue, either for this purpose or for the establishment and erection of the buildings of The University of Texas. (Underscoring ours).

"Sec. 15. In addition to the lands heretofore granted to The University of Texas, there is hereby set apart, and appropriated, for the endowment, maintenance, and support of said University and its branches, one million acres of the unappropriated public domain of the State, to be designated and surveyed as may be provided by law; and said lands shall be sold under the same regulations, and the proceeds invested in the same manner, as is provided for the sale and investment of the permanent University fund; and the Legislature shall not have power to grant any relief to the purchasers of said lands."

A few months after the Constitution of 1876 became effective, the Legislature by Act of August 14, 1876 (Acts 15th Leg. ch. 92, p. 136; 8 Gammels Laws, p. 972), provided for an Agricultural and Mechanical College for the benefit of colored youths, which was placed under the supervision of the Agricultural and Mechanical College established at Bryan in 1871.

The message of Governor O. M. Roberts to the Legislature, April 6, 1882, discloses that instead of erecting buildings for this institution, the land and buildings of Alta Vista, near Hempstead, were purchased and a school organized. The appropriation for this institution came out of the General Revenue and not out of The University Funds. Governor Roberts said "it is evident that this was not intended by the Legislature to be the 'college or branch university' referred to in Section 14, Article VII of the Constitution. For in the same section providing for that branch (Sec. 14) it is expressly provided that its location shall be determined by a vote of the people, and that 'no tax shall be levied and no money appropriated out of the General Revenue for this purpose', which could hardly have escaped the attention of the Legislature if they had intended by this Act to establish the 'college or branch university'."

The 16th Legislature (ch. 59, p. 181; 1879) provided for a normal school at Prairie View (formerly called Alta Vista) and attempted to appropriate from the University Fund $6,000.00 for its support. Prior to 1882 there were other appropriations made to the Prairie View School out of the available University Fund and other indications that certain officials believed this to be the Colored Branch contemplated by Section 14 of Article VII.

Pursuant to the Constitutional mandate, the Legislature in 1881 passed an Act creating The University of Texas and provided for a vote of the people to fix its location. The election was held and the proposal to separate the main university from the Medical Department prevailed, Austin being chosen for the former and Galveston for the latter.

In 1882 the Legislature recognized that the Prairie View Normal was not the colored branch of the University mentioned in the Constitution, and an election was ordered for the first Tuesday after the first Monday in November, 1882, to locate this branch. (Acts 1882, ch. 19, p. 25). The contesting places were Austin, Prairie View, Houston, Palestine, Paris, Brenham, Pittsburg and Georgetown. Austin was again successful. Governor Roberts in his message to the 18th Legislature, delivered January 10, 1883, said "all branches of The State University have now been located; the main branch at Austin; the Medical Department at Galveston; the Agricultural and Mechanical College at Bryan; and at the late General Election, the branch university for colored youths at Austin."

At the Regular Session of the 18th Legislature in 1883, an Act was passed to "provide for the permanent endowment, in lands or its proceeds, of The University of Texas and its branches, including the branch for the instruction of colored youths." (Acts 18th Leg., ch. 72, p. 71). This act set aside one million acres for an additional endowment of The University and its branches. The branch for colored youths was expressly included.

Between 1883 and 1897 no legislation pertaining to a negro college or branch of The University of Texas was passed, although several bills were proposed. In 1897 the Legislature set aside one hundred thousand acres of the public domain to be used for the endowment of the colored branch (26th Leg., 1897, ch. 109, p. 148), but later it was held that the public domain was exhausted (92 Tex. 58) and this endowment was never consummated.

In 1931 Article 2592 was enacted, which provided, among other things, that after September 1, 1934, the Available University Fund, derived as revenue from the Permanent Fund of one million acres of land provided for in the Constitution and the additional one million acres of land provided for in the Statute of 1883, should be allocated to The University of Texas and the Agricultural and Mechanical College in the proportions of two-thirds and one-third, respectively.

The 49th Legislature in 1945 enacted Article 2643a which changed the name of Prairie View State Normal and Industrial College to "Prairie View University." The Act further provided that "whenever there is any demand for same, the Board of Directors of the Agricultural and Mechanical College, in addition to the courses of study now authorized for said institution is authorized to provide for the establishment of courses in law, medicine, engineering, pharmacy, journalism, or any other generally recognized college course taught at the University of Texas, in said Prairie View University, which courses shall be substantially equivalent to those offered at the University of Texas.

When two additional statutory schools (West Texas A. & M. College and North Texas Agricultural College) were proposed in 1917, Attorney General B. F. Looney was asked for an opinion on the constitutionality of their establishment at places other than Austin or Bryan. The problem involved the same question of whether the Legislature had the power to establish institutions of higher learning in any other manner than as provided in Article VII of the Constitution. In an able opinion written by Luther Nickels, who later served as a Commissioner to the Texas Supreme Court, it was held that the Legislature was authorized under Section 48 of Article III, supra, to establish

other colleges and universities and support them out of the general revenue.

Judge Nickels pointed out that such statutory universities would not be branches of The University of Texas within the meaning of Article VII. A portion of this opinion is as follows:

> "Section 48 of Article 3 of the Constitution empowers the Legislature 'to levy taxes or impose burdens upon the people,' to raise revenue for the economical administration of the government in which may be included the following purposes:
>
> "'. . . The support of public schools, in which shall be included colleges and universities established by the State; . . .'
>
> ". . . The language is that the Legislature may provide for 'colleges and universities,' -- both terms being in the plural. This general language, undoubtedly, includes the 'University of Texas' and the 'Agricultural and Mechanical College' established by the Act of April 17, 1871, but it also includes such other 'colleges and universities as may be established by the State'. The term 'established by the State' is both prospective and retrospective in meaning; this must be true, because it modifies the term 'colleges and universities.' -- plural terms, -- while at the time the provision was adopted, there was but <u>one</u> university and <u>one</u> college for whose establishment provision had been made by the Legislature. The people certainly intended that support should be given the one university and the one college already established; they as clearly intended that others might be established, else they would have limited the provision to the one university and the one college instead of using the general plural terms 'colleges and universities.'

". . .

". . . Who, then, shall determine what shall
constitute a 'college' or a 'university,'
how many and what kinds of 'colleges and uni-
versities' we shall have, and when and where
they shall be located? The answer is obvious
The body -- the Legislature -- in whom is ves-
ted the general power, has also the power to
do all things needful for the full accomplish-
ment of the general purpose. . . . And that
the 'colleges and universities' which may be
established under the authority of Section 48
are not limited in number or kind by the pro-
visions with respect to the 'University of
Texas' and the particular 'Agricultural and
Mechanical College' referred to is a proposi-
tion demonstrable by the fact that the gen-
eral language of Section 48 is much too broad
to be limited to these two institutions and
their branches."

In 1928, the Attorney General was called upon to determir
whether the School of Mines and Metallurgy was a branch of The
University of Texas within the intendment of Article VII of th
Constitution, and if so whether money could be appropriated ou
of the general revenue to be used for the erection of building
at El Paso.

An Opinion by D. A. Simmons, then First Assistant Attorne
General, and recently President of the American Bar Associatio
held that the school was not a branch of The University; that
the Legislature had full authority to establish a School of
Mines and Metallurgy at El Paso under authority of Article II
Section 48, including erection of buildings with general reve-
nue funds. A portion of the opinion reads:

"It is a matter of common knowledge that the
available University fund is not sufficient
at this time to pay for the erection of build-
ings needed at the main university and the
Medical Department to say nothing of the
School of Mines and Metallurgy. . . . If
the School of Mines and Metallurgy is limited
by Article VII, Section 14, as a part of the
University of Texas, it can look only to the
available University fund just as the Univer-
sity proper, the Medical Department and the

colored branch must look to that fund. Paren-
thetically it may be presumed that this situa-
tion explains why the colored branch has never
been made a reality. On the other hand, if the
School of Mines is not limited by this consti-
tutional provision, it may apply to the Legis-
lature for all necessary relief.

"In our opinion, the School of Mines and Metal-
lurgy is not a branch of the University of
Texas, as the term 'branch' is used in the
Constitution of Texas." (Underscoring ours)

In Mumme vs. Marrs, supra, Chief Justice Cureton wrote
that Section 5 of Article VII defining the Available School
Fund, and declaring that "it shall be distributed to the
several counties according to their scholastic population",
was not a limitation which prevented the distribution of an
appropriation from the general revenue for common school dis-
tricts in accordance with the Rural Aid Act. In arriving at
such conclusion, Chief Justice Cureton said:

"The history of educational legislation in
this State shows that the provisions of Arti-
cle VII, the educational article of the Con-
stitution, have never been regarded as limi-
tations by implication on the general power
of the Legislature to pass laws upon the sub-
ject of education. This article discloses a
well-considered purpose on the part of those
who framed it to bring about the establishment
and maintenance of a comprehensive system of
public education, consisting of a general pub-
lic free school system and a system of higher
education. Three institutions of higher learn-
ing were expressly provided for.... The Legis-
lature, however, has gone far beyond the crea-
tion of the three institutions of higher learn-
ing specifically required by the organic law,
and has created ten additional institutions
of similar character without direct constitu-
tional grant, beginning with the Sam Houston
Normal in Huntsville in 1879. . . . In found-
ing these ten institutions, beginning more than
fifty years ago, the Legislature has necessar-
ily held that the specific grants of power con-
tained in the Constitution to erect and maintain
the University of Texas . . . were not limita-
tions on its power to create other schools of

similar purpose, and to maintain them by appropriations from the General Revenue. <u>This interpretation has never been questioned, and is consistent with authorities from other jurisdictions. . . ." (Underscoring ours).</u>

This holding in Mumme vs. Marrs was reaffirmed by the Supreme Court of Texas in giving an unqualified refusal to an application for writ of error in Watson vs. Sabine Royalty Corporation, 120 S. W. (2d) 938, a case upholding the constitutionality of a legislative Act providing for a different rate of tax valuation in a particular group of counties by a method different from that set out in the Constitution.

In the meantime, the Legislature, under its general powers and those specifically authorized by Section 48, Article III of the Constitution, has established to date fourteen statutory colleges, to wit:

John Tarleton Agricultural College, North Texas Agricultural College, Texas State College for Women, Texas College of Arts and Industries, College of Mines and Metallurgy, Texas Technological College, East Texas State Teachers College, North Texas State Teachers College, Sam Houston State Teachers College, Southwest State Teachers College, Stephen F. Austin State Teachers College, Sul Ross State Teachers College, West Texas State Teachers College, and Prairie View University.

It is important to note that although one of these statutory colleges is under management of The University of Texas Board of Regents, none of them have been held to be a branch of The University or subject to limitations or restrictions imposed by Article VII on the funds that may be used therefor.

### CONCLUSION OF TEXAS CONSTITUTIONAL PROVISIONS

The above background and history of legislative, judicial, and executive interpretations leave no doubt about the intent of the writers of the educational provisions of our Texas Constitution. They intended to provide for establishment of a great University of Texas with a separate negro College or Branch to be established <u>and maintained</u> out of the available University Fund. But in Section 14, Article VII, they left the time -- the "if" and "when" -- of such establishment to the sound discretion of the Texas Legislature by

use of the words "when deemed practicable"by the Legislature.

The same writers, in the same document (Sec. 48, Art. III), intended the establishment and maintenance of other colleges and universities out of general revenue funds. The first of these statutory institutions was in fact a negro college at Prairie View created by legislative Act in 1876, shortly after the present Constitution became effective. Some of the members of the Constitutional Convention were also members of the Legislature which interpreted the new Constitution as permitting and authorizing a statutory college in addition to the constitutional branch mentioned in Section 14. As heretofore pointed out, the President of the Constitutional Convention later served as President of the Board of Directors of A. & M. College and helped to organize and direct the activities of the separate negro college at Prairie View. If it be true that Section 14 presents the only manner in which a negro college can be established, then Prairie View University has been operated in violation of the Texas Constitution, since 1876. Such a construction would do violence to the plain and unambiguous words of the Constitution and to the intent and interpretations placed thereon by the men who wrote the document and the legislative and executive interpretations made thereon for the past 70 years. True, there were a few years during which certain officials mistakenly believed that Prairie View was the constitutional branch of The University and entitled to the use of the available University Fund (even Judge Cureton mistakenly referred to it as such in dictum in Mumme vs. Marrs, supra). But for the past 64 years Prairie View has been treated by the Legislature as a separate statutory institution entitled to appropriations from the General Revenue Fund. As stated above, during these years the Legislature has continued to so interpret and use its power in the creation of 13 additional statutory institutions of higher learning.

It is evident that during the past 70 years the Legislature has deemed it impracticable to establish and maintain a negro college or branch financed wholly out of income from the Permanent University Fund. An examination of the available revenues from such fund during the past 70 years reveals why such action was not only impracticable but impossible. Since 1876, the revenues from the fund have not been half enough to finance the building program, maintenance and operation of the Main University and the Medical Branch. During the same period of time it has been

necessary for the Legislature to appropriate from the General Revenue Fund in excess of fifty-three million dollars to maintain and operate these two institutions. Texas A. & M. College received no part of the available fund until 1931, and its share of one-third of such fund produces only a fraction of the money necessary to maintain and operate A. & M. College. During the first year of the present biennium the net revenue from the Permanent University Fund yielded only $1,932,711.41 for the Main University, the Medical Branch, and Texas A. & M. College. To this amount it was necessary for the Legislature to add $6,299,551.89 from the General Revenue to operate these schools for the past fiscal year. (Records of C. D. Simmons, Comptroller, University of Texas).

With these figures in mind, the present Legislature is certainly justified in deeming it impracticable to build and maintain a first class negro university out of the revenues from the University Fund. Senate Bill 140 calls for a total expenditure of two million dollars for the acquisition of land and the erection of buildings and provides one million dollars for maintenance and operation during the next two years. If maintenance of the negro university were limited to a portion of the available University Fund as required in the case of the constitutional branch (Sec. 14, Art. VII), it would be impossible to sustain a first class university of the magnitude contemplated by Senate Bill 140.

In so far as the Texas Constitution is concerned, it is our opinion that Senate Bill 140 is constitutional. Respecting your request for suggested changes or additions, our only advice in this connection is that a section be added specifically reciting the Legislature's intent and findings as to the impracticability of establishing the school in any other manner. Suggested wording of this section will be delivered with this opinion.

### U. S. CONSTITUTIONAL PROVISIONS

Fortunately, the operation of an educational system within a State is still a State right. It was so held in an opinion by Chief Justice Hughes in the case of Missouri ex rel Gaines vs. Canada, 305 U. S. Reports 337. The Federal Government and the Federal Courts have not thus far interfered with the management and operation of the educational systems of our states, except to say that under the 14th Amendment to the Constitution of the United States, equal protection of the law must be given all citizens, and State supported institutions must furnish equal facilities for both white and colored citizens. As late

as 1938 in the above case, the Supreme Court of the United
States recognized the right of the states to have separate
schools for white and negro citizens, if the separate system
furnished equal protection of the laws and substantially
equal educational facilities. The Supreme Court of the Uni-
ted States has not spoken directly on the point since 1938,
but it is sincerely believed that the Court will uphold Tex-
as' right to establish separate schools for negroes if it
actually and in fact provides substantially equivalent facili-
ties and equal protection as proposed in Senate Bill 140.

The pertinent portion of the 14th Amendment to the Con-
stitution of the United States reads as follows:

> "Section 1. All persons born or natura-
> lized in the United States, and subject
> to the jurisdiction thereof, are citizens
> of the United States and of the State
> wherein they reside. No State shall make
> or enforce any law which shall abridge the
> privileges or immunities of citizens of the
> United States; nor shall any State deprive
> any person of life, liberty, or property,
> without due process of law; nor deny to
> any person within its jurisdiction the equal
> protection of the laws."

The Texas Constitution, Section 7, Article VII, provides
the following:

> "Sec. 7. Separate schools shall be provided
> for the white and colored children, and impar-
> tial provision shall be made for both."

Since 1876 the policy of this State has been to maintain
separate schools and colleges as contemplated by Senate Bill
140. The people and public officials of Texas recognize that
equivalent educational opportunities have not been available
to the degree required by both State and Federal Constitutions,
or to the degree demanded by the public sentiment of the State.
But the majority of the people and public officials of Texas
also recognize that the only satisfactory means of accompli-
shing equal opportunities within the social order of this
State is to have separate schools for the separate races. A
recent state-wide poll of both white and colored citizens in-
dicated that such was the sentiment of a great majority of both
races. (Belden Texas Poll, January 26, 1947).

In spite of previous decisions of the United States Supreme Court and the sentiment of the majority of both races, there is some agitation in this and other Southern States against separate schools. This office today is defending a case in which one of the main contentions is that the legality of separate schools be denied. (Heman Marion Sweatt vs. Painter, et al, now pending in the Austin Court of Civil Appeals). Other cases are pending in Louisiana, Oklahoma and South Carolina. In each instance the negro applicants are contending for admission to the State Universities for white citizens, alleging that equal facilities do not exist for negroes, and concentrating their attack against the constitutionality of laws requiring separate schools. These contestants evidence as much interest in prevailing on the Supreme Court to reverse its former holdings and abolish segregation as in obtaining equivalent education in separate schools. With this in mind several of the leading decisions of the United States Supreme Court will be cited and discussed.

The United States Supreme Court in Plessy vs. Ferguson, 163 U. S. 537, said the following:

> "The object of the (14th) Amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and has been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of States where the political rights of the colored race have been longest and most earnestly enforced."

In the case of Missouri ex rel Gaines vs. Canada, supra, the United States Supreme Court considered the Missouri statutes requiring separate schools for colored and white students and reversed an opinion of the Supreme Court of Missouri, which had denied a negro applicant entrance to the University of Missouri Law School. In the opinion by Mr. Chief Justice Hughes, the Court said:

> "In answering petitioner's contention that this discrimination constituted a denial of his constitutional right, the state court has fully recognized the obligation of the State to provide negroes with advantages for higher education substantially equal to the advantages afforded to white students. The State has sought to fulfill that obligation by furnishing equal facilities in separate schools, a method the validity of which has been sustained by our decisions. Plessy v. Ferguson, 163 U. S. 537,544; McCabe v. Atchison, T. & S. F. Ry. Co., 235 U. S. 151, 160; Gong Lum v. Rice, 275 U. S. 78, 85, 86. Compare Cumming v. Board of Education, 175 U. S. 528, 544, 545. Respondents' counsel have appropriately emphasized the special solicitude of the State for the higher education of negroes as shown in the establishment of Lincoln University, a state institution well conducted on a plane with the University of Missouri so far as the offered courses are concerned. It is said that Missouri is a pioneer in that field and is the only State in the Union which has established a separate university for negroes on the same basis as the state university for white students. But, commendable as is that action, the fact remains that instruction in law for negroes is not now afforded by the State, either at Lincoln University or elsewhere within the State, and that the State excludes negroes from the advantages of the law school it has established at the University of Missouri. (Underscoring ours)

> "It is manifest that this discrimination, if not relieved by the provisions we shall

presently discuss, would constitute a denial of equal protection. That was the conclusion of the Court of Appeals of Maryland in circumstances substantially similar in that aspect. University of Maryland v. Murray, 169 Md. 478; 182 A. 590. It there appeared that the State of Maryland had 'undertaken the function of education in the law' but had 'omitted students of one race from the only adequate provision made for it, and omitted them solely because of their color'; that if those students were to be offered 'equal treatment in the performance of the function, they must at present, be admitted to the one school provided.' . . .

". . . it appears that the policy of establishing a law school at Lincoln University has not yet ripened into an actual establishment, and it cannot be said that a mere declaration of purpose, still unfulfilled, is enough. The provision for legal education at Lincoln is at present entirely lacking. Respondents' counsel urge that if, on the date when petitioner applied for admission to the University of Missouri, he had instead applied to the curators of Lincoln University it would have been their duty to establish a law school; that this 'agency of the State,' to which he should have applied, was 'specifically charged with the mandatory duty to furnish him what he seeks.' We do not read the opinion of the Supreme Court as construing the state statute to impose such a 'mandatory duty' as the argument seems to assert. . . .

". . . The basic consideration is not as to what sort of opportunities other States provide, or whether they are as good as those in Missouri, but as to what opportunities Missouri itself furnishes to white students and denies to negroes solely upon the ground of color. The admissibility of laws separating the races in the enjoyment of privileges afforded by the State rests wholly upon the equality of the privileges which the laws give to the separated groups within the State. . . .

"The equal protection of the laws is 'a
pledge of the protection of equal laws.'
Yick Wo v. Hopkins, 118 U. S. 356, 369.
Manifectly, the obligation of the State
to give the protection of equal laws can
be performed only where its laws operate,
that is, within its own jurisdiction.  It
is there that the equality of legal right
must be maintained. . . .

"Nor can we regard the fact that there is
but a limited demand in Missouri for the
legal education of negroes as excusing the
discrimination in favor of white. . . .

"Here, petitioner's right was a personal
one.  It was as an individual that he was
entitled to the equal protection of the
laws, and the State was bound to furnish
him within its borders facilities for legal
education substantially equal to those which
the State there afforded for persons of the
white race, whether or not other negroes
sought the same opportunity.

". . . We are of the opinion that the rul-
ing was error, and that petitioner was en-
titled to be admitted to the law school of
the State University in the absence of other
and proper provisions for his legal training
within the State."

It is interesting to note that by the time this case re-
turned to the Missouri Supreme Court and thence to the trial
court, the Legislature of Missouri passed a mandatory statute
providing an equivalent law school in Lincoln University (the
State's negro university), and the applicant therefore was never
admitted to the University of Missouri.

We have quoted at length from the leading Supreme Court
decision on the subject so that your committee may have full
knowledge of the requirements therein announced necessary to
sustain the constitutionality of separate schools.

Briefly stated, to meet the U. S. Constitutional provi-
sions, the system must (1) offer equal educational opportuni-
ties and (2) offer equal protection of the laws.  Applying

this test to the plan proposed in Senate Bill 140, the first requirement of equal opportunities and facilities surely will be met if this Bill is enacted and conscientiously administered by the Board to be appointed thereunder.

It is only on the second requirement -- equal protection of the laws -- that advocates of a constitutional rather than a statutory school raise two objections worth considering.

The first objection is that a constitutional College or Branch under Section 14, Article VII of the Texas Constitution would give the negro school larger and more permanent funds than those available to a statutory university; that by devoting all of the available University Fund to white schools already established, and financing the negro university from the general revenue, equal protection of laws is denied the negro race and the negro school. This objection involves a distinction without a difference and would have no bearing whatever on the constitutionality of Senate Bill 140. As far as finances are concerned, equal protection will be given so long as sufficient funds are appropriated to establish and operate an equivalent university for negroes. It makes no difference which pocket the State pays the money from so long as equal facilities are afforded. As far as money is concerned, this bill has nothing to do with the Permanent University Fund. In fact, a real discrimination and unequal protection would exist if the proposed university was created as a College or Branch under Article VII, because that Article (Sec. 14) denies use of the general fund for <u>maintenance</u> of a negro university, but permits use of the general fund for <u>maintenance</u> of the white university. Whether on purpose or through inadvertence, the writers of Article VII included a financial discrimination in Section 14 that does not apply to the other Sections. Senate Bill 140 would appropriate more money ($2,000,000.00) for construction of a negro university than the entire University Fund produced last year. It would appropriate $500,000.00 per year for maintenance and operation, a sum in excess of one-fourth of the total present annual revenue from the University Fund. It is obvious that this is more money than a constitutional Negro College or Branch would ever receive if confined to a share of the University Fund for its existence. Therefore, financially, far greater protection is given the statutory university under Senate Bill 140 than it would receive as a constitutional Branch under Section 14.

The only possible remaining financial argument is that the University and its branches for white students (Main

University, Medical School, and A. & M.) are using income from the available fund, part of which was intended for negroes, and that the Fund may become so great in the future that it would adequately finance all the constitutional branches (including a negro branch) when and if the general revenue should ever be insufficient. Morally this does sound unfair, but legally the answer is both fair and moral. To the extent of every dollar intended and needed for negro education out of the University Fund but actually used for white schools, the Legislature has been appropriating from the general revenue an equal amount for Prairie View, and now seeks to appropriate an even greater amount for a Negro University of the first class. When the day comes that the University Fund has so much revenue that it can adequately maintain and support the present constitutional schools and a Negro University, that may be the time when the Legislature will deem it practicable to establish a Negro College or Branch University under Section 14. Unless changed or repealed, Section 14 will remain for future use and needs if they should arise, and nothing done in connection with Senate Bill 140 will have any effect upon present or future rights of negro citizens accorded thereby.

The second objection made to a statutory university, under the requirement of equal protection of laws, is that a statutory school lacks the guarantee of permanence that is enjoyed by the constitutional schools; that equal protection from abandonment and change now afforded the constitutional white university and its branches would not be afforded the statutory negro university. This argument has apparent merit. It is not an objection that would make Senate Bill 140 unconstitutional, but it may be used as persuasive argument against the constitutionality of a system of separate schools which gives greater protection to the legal existence of the university for whites and its branches than to the university for negroes.

It is believed that there is enough merit in this last objection to warrant your consideration of a constitutional amendment recognizing the university which may be established by Senate Bill 140 as a constitutional university for negroes and giving the term of its existence the same guarantee as that now afforded the Main University for white students. Such amendment would necessitate no delay in consideration of Senate Bill 140. It could be submitted and voted upon after passage of Senate Bill 140, simply giving constitutional approval and recognition to the new university created by Senate Bill 140.

In this connection, considering the past, present, and prospective impossibilities and discrimination of Section 14

of Article VII of our Texas Constitution, you may wish to consider the advisability of repealing or amending that Section by substituting therefor the amendment suggested above and substituting financial provisions as contemplated by Senate Bill 140 in place of participation in an already inadequate Permanent University Fund. If such financial provisions are at least equal to any anticipated share for negroes from the University Fund, this would forever end the contentions now being made in the courts and public forum against a statutory university.

### CONCLUSION ON U. S. CONSTITUTIONAL PROVISIONS

As indicated above, it is the opinion of the Attorney General that Senate Bill 140 does not violate the 14th amendment to the Constitution of the United States. The State plan of separate schools is valid so long as substantially equal facilities and equal protection of the laws are afforded.

A decision to this effect was recently made by a District Court of Travis County in the case of Sweatt vs. Painter, et al. This case is now on appeal, and all indications are that it will go to the Supreme Court of the United States. Thus, unless the 50th Legislature takes immediate action on this subject, the Supreme Court may be called upon to pass on the issue of separate schools in Texas without knowledge of the prevailing sentiment, intention, and actual establishment of a first class negro university in Texas.

Prompt enactment of a bill similar to Senate Bill 140 would actually provide what our Negro citizens are entitled to, and it would have a great bearing upon successful defense of the constitutionality of separate schools. Both of these propositions are of foremost importance to Texas. If the Bill is enacted, this office will make known its existence and operation to the courts in all pending cases.

In line with your request for suggestions, it is further recommended that the provisions of the Bill for interim instruction pending establishment of the Texas State University for Negroes be strengthened and made mandatory. The suggested changes and additions have been prepared and will be delivered herewith.

## SUMMARY

(1)  Section 14, Article VII of the Texas Constitution providing for a colored College or Branch of the University "when deemed practicable" by the Legislature, does not limit the power of the Legislature to establish a separate and different statutory university for negroes under the general powers expressed in Section 48, Article III of the Constitution.

(2)  The requirement of separate schools and colleges for negro citizens does not violate the 14th Amendment of the Constitution of the United States if the separate system affords substantially equal educational opportunities and equal protection of the laws.

(3)  Senate Bill 140 of the 50th Legislature is constitutional.  With the added provisions suggested in this opinion, its enactment and contemplated operation thereunder would afford the fair and equal educational opportunities and protection of laws to which negro citizens of Texas are entitled.  Its early enactment and operation will add great strength to Texas' position in pending cases wherein the constitutionality of separate schools is under attack.

Respectfully yours,

Price Daniel
Attorney General of Texas

Joe R. Greenhill
Assistant Attorney General

The foregoing opinion, written by the Attorney General and Mr. Greenhill, was considered and approved in Conference composed of the First Assistant, and Assistant Attorneys General Ocie Speer, Jackson Littleton, Bruce W. Bryant, and Ben Rice III.

Fagan Dickson
First Assistant Attorney General
Chairman of the Conference